STATE OF MARYLAND, DEPARTMENT OF
HEALTH & MENTAL HYGIENE *v.*
CONGOLEUM CORPORATION

[No. 846, September Term, 1981.]

*Decided March 12, 1982.*

The cause was argued before LOWE and MASON, JJ., and RICHARD M. POLLITT, Chief Judge of the First Judicial Circuit, specially assigned.

*Marc K. Cohen, Assistant Attorney General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellant.

*Roger D. Redden,* with whom was *David M. Funk* on the brief, for appellee.

Lowe, J., delivered the opinion of the Court.

The Congoleum Corporation, located in the vicinity of Finksburg, Maryland, has, since 1967, unsuccessfully fought an infestation of psychoda flies which breed in the trickling filters Congoleum has provided for treatment of its waste waters prior to their discharge into the Patapsco River, one-half mile away. The waste water treatment consists of two lagoons, two trickling filters and two clarifiers. Although the gnat-like creatures are annoying, especially when in substantial numbers, they are not known to be detrimental to health. The flies do not appear to have excessively annoyed the employees of Congoleum; however, complaints of nearby residents appear to have been in proportion to the vigor of the Company's attempts to control the flies, which may be wind-carried well beyond their limited flight potential.

Increased complaints in 1978 brought about intensified efforts, including the retention of a licensed exterminating firm recommended by a professional entomologist. In that year, the State Department of Health and Mental Hygiene (which had contributed very little assistance in controlling the problem, save exerting increasing pressure upon the Company) ordered the Company:

1. to remove vegetation in and around the filters,
2. retain the licensed exterminator,
3. submit for approval any pesticide to be sprayed in the trickling filters, and
4. submit an annual and comprehensive program to control the flies; then comply with its provisions.

Congoleum has complied with the first two of the requirements, but there the lines were drawn. It requested an administrative hearing, at which the order was upheld by the Hearing Officer, and then unsuccessfully appealed the

order to the Board of Review. On appeal to the Circuit Court for Carroll County, however, Congoleum succeeded in convincing the court that, because "there is no danger to the public health nor is there any [allegation [1]] that the public waters are being polluted," the portion of the order directing the submission of, and compliance with, an annual pest control plan was invalid. With regard to the requirement that the Company receive approval from the Department's Toxic Substances Control Program of any proposed pesticide before spraying the trickling filters, the trial judge reasoned implicitly that because the authority to control pesticides was delegated to the Secretary of Agriculture, such delegation preempted any control by the Health Department.

The Board of Review had adopted the findings and reasoning of the Hearing Officer, as had the Secretary of the department. That report initially concluded that there was sufficient evidence to conclude that the fly infestation in the communities neighboring Congoleum emanated from the trickling filter waste water disposal system of that Company.

"The Administration has established that the psychoda flies breed at the Company's trickling filters and that there are psychoda flies in the neighboring communities. There was no evidence presented by the appellant to indicate the location of any other sources of the psychoda fly infestation other than their own trickling filters. Although the psychoda flies can only travel a short distance, the same can be windblown. The testimony of Dr. Singer indicated that she believed that the Company's trickling filters were the primary source for the psychoda fly infestation in the Cedarhurst-Finksburg area. Her belief was based on County and DHMH investigations of possible

1. The inappropriate, but phonetically similar word "delegation" appeared in the opinion. We have substituted that which is appropriate.

alternative breeding places for flies in and around the area.

It is concluded that these investigations were sufficient to eliminate the possibility of any alternative source. It is further concluded that the Administration has met the burden of proof absence [sic] any rebuttable evidence presented by the appellant to indicate that the fly infestation in the communities surrounding the Company's property originated from its trickling filters."

Because the judge did not take issue with these findings, and even predicated his opinion on the presupposition that such facts amounted to substantial factual evidence to support the conclusions reached by the Board, we will not address the sufficiency of evidence issue, except to note that it meets the required test of being "believed by the factfinder," which it obviously was.

The trial judge appears to have held that the opinion of the Board of Review was affected by error of law and that the order was in excess of the authority of the Secretary. Md. Ann. Code (1957, 1978 Repl. Vol., 1981 Supp.) Art. 41, § 255 (f) (2) and (4). According to the judge, in order for the department to have authority to compel pest control program submission and compliance relating to the waste water disposal system, there must be 1) some public health (as opposed to comfort) concern which must be 2) directly related to the purity of State waters.

"The Secretary of Health and Mental Hygiene takes the position that, because the psychoda flies breed in the corporation's trickling filters and have been determined by the Secretary to be a source of public discomfort he is empowered by Sections 388 and 397 [Md. Code, Art. 43] to issue the Order. In our opinion, the reliance on the word 'comfort' in the statute is overly broad. As we noted *supra,* there is no danger to the public health nor is there any delegation [sic allegation]. We have carefully reviewed the enabling Statute, Chapter 810, Sec-

tion 2 and 11 Laws of Maryland 1914, and the Amendments thereto. We believe that there must be some reasonable relationship between the Order passed by the Secretary and the purity of the waters of the State. We find no such relationship in this case."

## "comfort"

Appellee, picking up on the judge's observation as to the breadth of the definition of the word "comfort", points out that:

> "*The American Heritage Dictionary of the English Language* (1969 Edition) attests to the breadth of meaning associated with the word 'comfort': '-n. 1. A state of ease or well-being. 2. Relief; consolation; solace. 3. Help; assistance. 4. One that brings ease. 5. Capacity to give physical ease and well-being: *enjoying the comfort of his favorite chair.*' "

It appears, however, with but brief perusal, that the dictionary it quoted has relatively few words without more than one definition. Words of ordinary meaning used in a statute are assumed to mean that which it is generally intended to convey. *John McShain, Inc. v. State,* 287 Md. 297, 301 (1980). Few, if any, of us understand the term "comfort" to relate exclusively to a "favorite chair", as employed in the example appellee provided from the fifth dictionary definition. Common sense dictates that comfort relates to a state of ease or well-being and it is not difficult to determine when that is prevalent, interrupted, or interefered with.

Appellee further contends that we must apply the principle of *noscitur a sociis, i.e.,* that " '[w]ords are known by the company they keep,' " or *ejusdem generis* which reasons that general words are not to be construed in their widest extent but are to be held as applying only to persons or things

specifically mentioned.[2] But these rules obviously apply to specific words conjunctively intended to be joined to those general references. It would be absurd to apply either doctrine to two words in the disjunctive. It is most unlikely that when the Legislature uses the terms "public health *or* comfort", it meant to limit the department's control over health matters that were uncomfortable, or comfort matters that were unhealthy. Statutes should never be read so as to make *any* of the words meaningless. *Balto. Bldg. & Constr. Trades v. Barnes,* 290 Md. 9, 15 (1981). To the contrary, the extended meaning following the disjunctive was obviously used to indicate that the authority of the department was broader than related to matters of public health only. It indicated that the Legislature was concerned with the public's state of well-being, as well as its organic functioning.

But even if we were persuaded by the "words of a feather" doctrine as described by appellee, the legislative intent could be determined from a companion section of Art. 43. Section 391 provides that when any disposal system is inefficiently operated so as to be, or appear to become, "in any way a menace to health or comfort, or is creating a nuisance, it shall issue an order. . . ." Applying appellee's doctrine of interpretation to this section (which is also appropriate to the facts here) while the general term "comfort" might be restricted by the term "health", it would here be explained as including a "nuisance". Alas, however, one who can find no common understanding of the meanings of "comfort" would be equally nonplused by what might constitute a "nuisance." We have no difficulty with either.

Appellee carries its rationale even to a constitutional

---

**2.** "[T]he established rule of *ejusdem generis* [provides] that where general words in a statute follow the designation of particular things or classes of subjects or persons, the general words will usually be construed to include only those things or persons of the same class or general nature as those specifically mentioned. This rule is based on the supposition that if the Legislature had intended the general words to be considered in an unrestricted sense, it would not have enumerated the particular things." Smith v. Higinbothom, 187 Md. 115, 130 (1946).

dimension, arguing that "comfort" is an unconstitutionally vague term. It contends that:

"Although it is possible for a person to order his behavior to avoid affecting the public health, the public comfort (unless grounded in some concept of the public health) is so amorphous that a person of ordinary intelligence would likely find it impossible to know when his conduct might be deemed by the Secretary harmful to the public comfort."

"Words are granted their ordinary signification so as to construe the statute according to the natural import of the language used without resorting to subtle or forced interpretations for the purpose of extending or limiting its operation." *Schweitzer v. Brewer,* 280 Md. 430, 438 (1977). We find it incredible that appellee would suggest that ordinary, intelligent people could not readily identify discomfort far more easily even than matters related to the more scientific connotation understood by the term "health". We reject that constitutional argument (which was not decided below) as well and adhere to the Legislature's admonition that this subtitle, "Water and/or Sewer Authorities", be "liberally construed". Md. Ann. Code (1957, 1980 Repl. Vol.) Art. 43, §§ 465, 671.

### "waters of the State"

But even assuming the judge had not been uncomfortable with the "overly broad" reliance the Secretary (and Board) placed on the word "comfort", the essence of his opinion seems to be that

" ... there must be some reasonable relationship between the Order passed by the Secretary and the purity of the waters of the State."

This conclusion appears to have been drawn from the first sentence of the general powers section of the Health Article, Md. Ann. Code (1957, 1980 Repl. Vol.), Art. 43, § 388.

"The State Board of Health shall have general supervision and control over the waters of the State, insofar as their sanitary and physical condition affect the public health or comfort; and it may make and enforce rules and regulations, and order works to be executed, to correct and prevent their pollution."

But the additional authority that follows is not limited to the "waters of the State" authority which preceded it. The statute continues by giving additional authority and responsibility.

"It shall investigate all sources of water and ice supply, and all points of sewage discharge. It shall examine all existing public water supplies, sewerage systems and refuse disposal plants, and shall have power to compel their operation in a manner which shall protect the public health and comfort, or to order their alteration, extension or replacement by other structures when deemed necessary. After April 16, 1914, it shall pass upon the design and construction of all public water supplies, sewerage systems and refuse disposal plants which shall be built within the State."

It is apparent that if the waste water treatment system of Congoleum were breeding a contagious disease, the germs of which were transmitted by the wind, as the psychoda flies had been, the Health Department was not only authorized to act but was charged with the responsibility to do so, despite that the offending organisms were contaminating the surrounding air as opposed to contaminating the waters of the State.[3]

---

3. It should be noted that the "waters of the State" has an extraordinarily broad definition as defined for purposes of waste water treatment. Md. Ann. Code (1957, 1980 Repl. Vol.), Art. 43, § 387.

"The term 'waters of the State' shall include that portion of the Atlantic Ocean and its estuaries within the State of Maryland, the Chesapeake Bay and its estuaries, and all springs, ponds, streams, wells and bodies of surface or ground water, whether natural or artificial, within the boundaries of this State or subject to its jurisdiction."

The judge may also have been misled by reading the first half of the opening sentence in § 397.

> "Whenever the State Board of Health shall find that any of the waters of the State are polluted by wastes from any manufacturing or industrial establishment, in such a way as to be or to be liable to become a menace to the public health or comfort . . ."

But again the disjunctive is used by the Legislature to make clear that what follows is an authority in addition to, but not limited by, what went before:

> "*or* whenever the existing method of waste disposal in a manufacturing or industrial establishment is found to be or be liable to become in any way a menace to health or comfort, the State Board of Health shall issue an order requiring the owner of such establishment to cease pollution of the body of water into which the waste is discharged, *or* to make such alterations in the method of disposing of said waste, as the Board may deem necessary to protect the public health and comfort; and said order shall be complied with within such time as the State Board of Health shall determine. Plans for all such changes in the method of disposing of trades wastes shall be submitted to the State Board of Health for approval, and all construction shall be carried out in conformity therewith. If the State Board of Health shall approve the plans submitted, it shall issue a permit for the use of the method proposed for taking care of the waste, and no revised method for taking care of said waste shall be put into effect without such permit. The owner of any manufacturing or industrial establishment shall submit to the State Board of Health, on demand, all plans, information and records regarding the existing methods used for the disposal of wastes at that establishment."

Where statutory language is plain and free from ambiguity, and expresses a definite and sensible meaning, courts are not at liberty to insert or delete words or ignore phrases which cause the statute to express an intention which is different from its plain meaning. *Giant of Md. v. State's Attorney,* 267 Md. 501, 512 (1973); *Gatewood v. State,* 244 Md. 609, 617 (1966). The language is clear and the meaning is plain. Just as § 388 provides departmental responsibility for the waters, then adds its responsibility for sewerage systems, etc.; § 397 in the same style gives the enforcement authority to carry out these responsibilities. No interpretative aids are needed such as appellant's attempt to resurrect the title of the original bill as a modification of the clear language of the statute. The title [4] is a draftsman's synopsis of the Act's content to advise interested persons of the subject embraced. *Madison Nat'l Bank v. Newrath,* 261 Md. 321, 337-338 (1971). Each section addresses two separate areas of responsibility: 1) waters of the State and 2) waste disposal systems. These areas of responsibility are not inexorably interwoven, they are separate spheres of control limited only by their relationship to public health or comfort.

— pesticides —

Our opinion thus far disposes only of the authority of the Department to require a program to control the flies. The court also implicitly held that because the Secretary of Agriculture was authorized to regulate and control pesticides, the Health Department could not require prior approval of pesticides contemplated by Congoleum to be used on the advice of its licensed exterminator. Here, however, the judge *should* have recalled the responsibility of the Department to supervise the waters of the State, vis-a-vis pollutants or potential pollutants from waste water treatment plants. § 397. It is illogical to assume that because chemicals or

---

4. Referred to by appellee as the "purpose" clause.

pesticides might be subject to approval for purposes within the aegis of the Department of Agriculture, see Md. Agric. Code Ann. (1974), Title 5, "Pesticide and Pest Control", potentially toxic ingredients from industrial waste water systems may not be kept from polluting the waters of the State by the Health Department, whose responsibility over State waters begins when pollution thereof causes them "to be or to be liable to become a menace to public health or comfort . . ." § 397. In fact, the Department of Health and Mental Hygiene expressly may set water quality and effluent standards with particular regard to sale, offer, use or storage of pesticides which constitute a water pollution hazard in the determination of the Department. Md. Nat. Res. Code Ann. (1974, 1981 Cum. Supp.), § 8-1405 (b) (4). Although overlapping jurisdictions are administrative anathema, it is far better to have some spheres of dual control, than a public vacuum subject to no protection. See, *e.g.,* overlapping responsibility of Department of Natural Resources. But see the Executive Order of January 17, 1980, reorganizing the State Government in the Environmental Area pursuant to Md. Const. Art. II, § 24. While the Health Department may not have the power to tell an exterminator not to use a certain pesticide to exterminate within the aegis of Title 5 of the Agriculture Article, it may tell him that he shall not introduce it into the waste water and dispose of its residue in the public waters. See Nat. Res. Art., § 8-1405 (b) (4), *supra.* But that is not what was decided below.

> "With reference to that portion of the Order of the Secretary that requires Congoleum to secure approval of the Department's Toxic Substance Control Program with respect to any pestisides [sic] used we note that the General Assembly has delegated to the Secretary of Agriculture the authority to regulate and control the use of pesticides. There is no evidence that the pesticides used by the Corporation are other than those approved by the Secretary of Agriculture."

As appellee acknowledges, the evidence shows that Congoleum's waste water passes through the two trickling filters located approximately one-half mile prior to the point of discharge into the Patapsco River in the immediate vicinity of the Liberty Dam Reservoir which provides drinking water for a substantial populace. That concession alone, coupled with the admission that appellee had used, and intended to use, pesticides and other chemicals in its waste water treatment system upon recommendation of its exterminator, is clearly a sufficient foundation to justify the preventive order. The introduction of as-yet-unknown chemicals into a process that culminates in the river is sufficient proof that the existing waste water disposal is "*liable to*", in some way, "become . . . a menace," — in this instance not only to comfort, but to health as well. The department may prevent pollution of our waters, especially our drinking water; it need not, and should not, wait until the harm is done. See *State Dep't v. Baltimore County,* 281 Md. 548, 560 (1977); *Board of Health v. Crew,* 212 Md. 229, 239 (1957). The responsibility of the Department is clearly set forth in that regard in Art. 43, § 386 E.

> "(a) The secretary, upon receipt of information that a contaminant which is present in or if proven to the Secretary is likely to enter a public water system would present an imminent and substantial endangerment to the health of persons, may take any action necessary in order to protect the health of such persons.
>
> (b) The actions which the Secretary may take include, but shall not be limited to:
>
> (1) Issuing orders necessary to protect the health of persons who are or may be users of the system, including travelers, and

(2) Commencing a civil action for appropriate relief, including a restraining order or permanent or temporary injunction."

> *Judgment of the Circuit Court for Carroll County reversed; case remanded to that Court for the purpose of affirming the judgment of the Board of Review of the State Department of Health and Mental Hygiene; costs to be paid by appellee.*