**William H. HARRIS & Frank C. Harris & John P. Harris, III & Wesley S. Freeman, Directors and Trustees of the Assets and Liabilities of Freeman Construction Co., Inc.**

v.

**William EICHBAUM, individually and in his capacity as Assistant Secretary of Health for Environmental Matters, Md. Department of Health & Mental Hygiene, and Charles R. Buck, individually and in his capacity as the former Secretary of the Department of Health & Mental Hygiene, and Ronald Nelson, individually and in his capacity as Director for Waste Management Administration, Md. Department of Health and Mental Hygiene.**

Civ. A. No. M–84–4451.

United States District Court, D. Maryland.

Sept. 2, 1986.

---

Steven A. Allen and Davis, Fedder & Allen, Baltimore, Md., for plaintiffs.

Kathie A. Stein and Michael C. Powell, Asst. Attys. Gen., Baltimore, Md., for defendants.

## MEMORANDUM OPINION

JAMES R. MILLER, Jr., District Judge.

Plaintiffs, William Harris, John Harris, Frank Harris, and Wesley Freeman, are the directors and trustees of the assets and liabilities of the Freeman Construction Co., Inc. ("Freeman"). Plaintiffs filed this action against defendants, William Eichbaum, Charles Buck, and Ronald Nelson, individually and in their official capacities as officials of the Maryland Department of Health and Mental Hygiene (DHMH), alleging causes of action under 42 U.S.C. §§ 1983 and 1985 for defendants' delaying issuance of, and subsequently denying, a permit for the disposal of sewage sludge (Paper No. 1).

In its Memorandum and Order of September 26, 1985, this court dismissed plaintiffs' claims for damages from defendants in their official capacities, their claims un-

der § 1985, and their claims for alleged violations of their procedural due process rights (Paper No. 6). The court held, however, that claims had properly been stated against the individual defendants for violations of plaintiffs' substantive due process rights and of their rights under the Equal Protection Clause (id.).

Defendants have filed a Motion for Summary Judgment (Paper No. 23), in which they contend that (1) they are entitled to qualified immunity; (2) they should prevail on the merits because they acted in a reasonable manner in performing a proper, governmental function; (3) plaintiffs' damage claims for lost profits and damage to reputation are too speculative to permit recovery; and (4) plaintiffs' claims are barred, in whole or in part, by the statute of limitations. Plaintiffs have opposed the motion (Paper No. 31), defendants have replied (Paper No. 28), and plaintiffs have filed a Supplemental Memorandum (Paper No. 36). On April 17, 1986, oral argument was held on the motion.

## I. *Factual Background*

Prior to 1981, Wesley Freeman was involved in the construction business. Freeman believed that he could earn substantial profits by removing sewage sludge from a storage facility, transporting the sludge to a site for use as a free fertilizer on agricultural land for the purpose of growing sod, and, ultimately, harvesting and selling the sod. In pursuing this venture, Freeman obtained the financial support of co-plaintiffs William, John, and Frank Harris, and that of their parents.

Baltimore City runs a sewage treatment plant at Back River (Nelson Dep. at 35). As of 1980, Back River sewage sludge was being stockpiled in holding lagoons (id. at 12–14).

Because of disposal problems associated with sludge, Baltimore City, the operator of the Back River facility, was willing to pay contractors to remove sludge from Back River and dispose of it. Baltimore City contracted with Browning Ferris Industries ("BFI") to remove sludge from Back River. BFI in turn contracted with Mr. Freeman to remove and dispose of quantities of the sludge.

In January 1981, Mr. Freeman applied for a permit for the disposal and use of Back River sludge to grow sod on 63 acres of an 82–acre farm located on Pleasant Grove Road in Boring, Baltimore County, Maryland. On or about July 7, 1981, Freeman purchased the Boring property for Two Hundred Thirty Thousand Dollars ($230,000.00), plus closing costs of approximately Ten Thousand Dollars ($10,000.00). On July 15, 1981, the DHMH issued a permit authorizing Freeman to apply Back River sludge on the Boring property at a rate of 40 dry tons of sludge per acre. At that time, Buck was Secretary of the DHMH, Eichbaum was the Assistant Secretary for Environmental Programs, and Nelson was Director of the Waste Management Administration.

In July 1981, Freeman, Inc. was incorporated in the State of Maryland. Prior to its incorporation, Mr. Freeman had conducted his business as the unincorporated Freeman Construction Company. Plaintiffs were the only stockholders of the corporation.

In July or August 1981,[1] Freeman, Inc. made application for a second sludge disposal permit, the permit which is the subject of the instant action, for use of Back River sludge on a second parcel of agricultural land in Northern Baltimore County located on Middletown Road. The application sought a permit for the disposal of sludge on 131 acres of the 240–acre Middletown Road site. This application requested issuance of a permit authorizing a sewage sludge application rate of 48 dry tons of sewage sludge per acre at the Middletown Road site.

At this time, applications for permits were initially submitted to the Waste Management Administration. If the tech-

---

1. Plaintiffs allege that the application was originally filed in July 1981, but that the DHMH lost this application, making it necessary for them to file a new application in August.

nical staff of the Waste Management Administration approved the application for permit, the permit was then submitted to Director Nelson for his review and signing (Nelson HR 237–239). If Director Nelson signed the permit, the permit was then submitted to Assistant Secretary Eichbaum for final approval. Once the permit was manually or stamp signed by Assistant Secretary Eichbaum, the permit was issued. At his level of the approval process, Assistant Secretary Eichbaum did not generally become involved in the actual evaluation of each permit unless particular issues involving a particular permit were specifically brought to his attention by Nelson. Defendant Buck, Secretary of the DHMH, also did not generally personally involve himself in the decision whether or not to issue a particular permit.

Plaintiffs allege that they were given numerous promises that the permit applied for by Freeman, Inc. would be issued, but allege that despite such promises, "defendants had no intention of issuing the permit and were acting in bad faith and for political reasons." (Paper No. 1, ¶ 18). They allege that defendants withheld the permit "because they were requested to do so by Senator Francis Kelly of the Maryland State Senate" (*id.*, ¶ 19) and "in order to avoid what the defendants considered unfavorable action on the part of the legislature in passing legislation effecting [sic] the Department of Health and Mental Hygiene" (*id.*, ¶ 21). Plaintiffs characterize the alleged reliance on these grounds for delaying issuance of the permit as "illegitimate 'political' or at least personal motives" (*id.*, ¶ 22).

The evidence appears to be quite clear that, had it not been for pressure from citizens' groups and legislators, Freeman, Inc. would have been issued its permit. The permit application sought authorization for a slightly higher sludge application rate at the Middletown Road site than had been the case at the Boring site—48 dry tons/acre as opposed to 40 dry tons/acre. Plaintiffs had obtained the necessary approvals from the Baltimore County zoning and health departments. The Middletown

Road permit had been approved for the requested 48 dry ton/acre rate by the technical staff of the Waste Management Administration and, apparently, those technical staff individuals had determined that the proposed application of 48 dry tons/acre at the Middletown Road site did not present any environmental or public health problems in light of Federal EPA, FDA and USDA standards.

The permit was then submitted to Nelson, who approved the permit, signed it, and submitted it to Eichbaum, the final approval needed for issuance of the permit. It was at this point that the permit issuance process was stalled.

Residents of the Middletown area had apparently been unaware of the proposed sludge use prior to Freeman's distribution of flyers in October 1981, outlining the nature of the project (Paper No. 31, Exh. 7). When news of the project spread, the DHMH was deluged with phone calls from residents inquiring about, and expressing dissatisfaction with, the proposed use of the property. It appears that some residents also contacted their representatives in the state legislature and requested that they look into the matter.

The primary opposition from legislators and citizens' groups took place in October and November 1981. The evidence submitted by both parties indicates that opposition was based on what the legislators and citizens believed were health and environmental problems with the project. For example, the letter sent to Eichbaum from Senator Kelly, dated November 12, 1981, stated in relevant part:

"I have received numerous calls from constituents who are seriously concerned about the health problems this project presents. I expect that you will hold this permit until I have the opportunity to set up a meeting with community leaders, Delegate Sauerbrey, myself, and you and your staff."

(Paper No. 31, Exh. 2).

In addition, a "Citizen Input Paper" dated November 23, 1981, was prepared with

respect to the project (Paper No. 36, Exh. 6). The stated objective of the paper was to "[d]emonstrate that the proposed application of 48 dry tons per acre of Back River Sewage Treatment Plant Sludge to the Middletown Road Freeman Construction Company property is *not* in compliance with existing Maryland State Department of Health and Mental Hygiene guidelines (or the similar University of Maryland Agronomy Department guidelines), and that the application presents a public health hazard, danger to the environmental health, and a nuisance." (*Id.*, Exh. 6 at 2). The 17–page paper asserted that the proposed project failed to comply with DHMH guidelines and presented potential public health and environmental hazards with respect to, *inter alia*, spillage problems on roadways and private lands; hazardous traffic conditions from the proposed 70 trucks per day; public exposure to pathogens in sludge; foul odor from putrification of sludge; contamination of groundwater by leaking of heavy metals, chemicals, and excess phosphorous and nitrogen; contamination of surface water through runoff; irreversible harm to scarce farm land resources; destruction of the Loch Raven watershed recharge area by clear cutting trees and by contamination; and impact on wildlife through ingestion of toxic materials through plants and surface water contamination.

In mid-November, Freeman was informed by Lawther, a state hydrogeologist, that a relative analysis report would be necessary, and this report was completed on November 30, 1981 by Metcalf & Eddy, a private consulting company hired by Freeman (Paper No. 36, Exh. 5). The report, addressing DHMH's and Baltimore County's "major concerns" of the appropriate application rate and the need for monitoring, recommended sludge application rates for the site of 17 to 26 dry tons/acre and listed a number of recommended monitoring methods (*id.* at 2–3). The report noted that this rate of application "allows nitrogen applications in excess of crop uptake," but continued that "[m]aximum additions of nitrogen ... are limited such that

nitrate-nitrogen concentrations in water reaching below the root zone on the average would not exceed drinking water standards." (*Id.* at 2).

Wesley Freeman avers that, following this analysis, plaintiffs were told that it had been decided that a permit would be issued with an application rate of 30 dry tons/acre instead of the 48 dry tons/acre permit originally contemplated (Paper No. 31, Freeman Aff., ¶ 18). Plaintiffs do not indicate that they opposed this purported lowering of the acceptable application rate from 48 to 30 dry tons/acre, apparently due to the conclusions in the Metcalf and Eddy report. Wesley Freeman does not indicate in his affidavit who allegedly told him of the decision to reduce the application rate, but states that, as a result of a December 1, 1981 meeting between himself, his attorney, and Stricker, Spencer, and Lawther from the state, "we were advised that an application rate of only 30 dry tons of Back River Sludge per acre would be approved." (*Id.*). He continues that he was informed that the 30 dry tons/acre permit "would be approved as a two-part permit, with an initial approval rate of 6 dry tons per acre and a contingent approval rate of 24 dry tons per acre subject to our complying with three conditions suggested by Metcalf and Eddey [sic] in their report." (*Id.*). Similarly, Sfekas, Freeman's then attorney, states that "Eichbaum told me he intended to sign the Middletown Road permit, which had been amended to provide for a two-part permit for the application of between six and thirty dry tons of Back River sludge per acre" (*id.*, Sfekas Aff., ¶ 9).

Sfekas and Wesley Freeman state that they were informed that the permit would be signed on December 7, 1981 (*id.* Sfekas Aff., ¶ 9; Freeman Aff., ¶ 19). The permit was not issued, and on December 9, 1981, Sfekas learned from Eichbaum that the signing of the permit would be delayed until after December 17, 1981, the date it was represented to him that Eichbaum and Buck intended to hold another public meeting (*id.*, Sfekas Aff., ¶ 12). Sfekas also

states, however, that he learned on the same day from Robert Sheesly, an employee of Baltimore County, that Baltimore County Council intended to consider a change to the County Zoning Ordinance on December 16, 1981, which would prohibit the use of the Middletown Road site planned by Freeman (*id.*, Sfekas Aff., ¶ 12).

On December 10, 1981, Freeman, Inc. filed suit in the Superior Court of Baltimore City to force the DHMH to issue the permit, and on December 11, 1981, Judge Joseph H.H. Kaplan, after a hearing on the matter, ordered defendants to issue a permit for the Middletown Road site by December 15, 1981.

On December 15, 1981, DHMH issued a permit for the application of 6 dry tons/acre of Back River sewage sludge to the Middletown Road site and informed Freeman that, if it desired a higher rate of application, it would have to file a new application. Defendant Eichbaum states that the 6 dry ton/acre figure was based on the nitrogen requirements of sod (Paper No. 28, Eichbaum Aff., ¶ 4). This act of issuing the permit only for sludge at a rate containing nitrogen in an amount equal to the nitrogen requirements of sod, but not permitting sludge to be applied at a rate allowing application of nitrogen to the land in quantities in excess of crop uptake, is consistent with defendants' statements that they were concerned about possible nitrate contamination of drinking water supplies (Paper No. 23, Eichbaum Aff., ¶ 4; Nelson Aff., ¶ 5).

According to Nelson, in November 1981, the public and legislators brought a number of concerns to his attention, including two subjects which had not been considered by him or the Waste Management Administration—the potential for excess nitrogen leading to nitrate contamination of potential drinking water supplies, and the long term maintenance of soil acidity or alkalinity to insure that toxic heavy metals in Back River sewage sludge did not migrate through the soil to groundwater (Paper No. 23, Nelson Aff., ¶ 5).

In addition, Eichbaum states in his affidavit that he declined to issue the permit because:

"A. Persons outside the Department of Health and Mental Hygiene had raised questions of possible nitrate contamination of drinking water supplies which had not been answered to my satisfaction.

B. Questions regarding protection against the offsite migration of heavy metals found in Back River sewage sludge had been raised but not answered to my satisfaction."

(Paper No. 23, Eichbaum Aff., ¶ 4).

Plaintiffs, however, contend that while the 6 dry tons/acre amount was arrived at based on the nitrogen uptake of sod, it was not based on any finding that to apply more then 6 dry tons/acre would have been environmentally unsafe or a public health hazard. Plaintiffs contend that defendants had a duty to determine a rate which did not cause an environmental or public health hazard, not a rate which merely was sufficient to grow sod. Plaintiffs contend that there was no evidence to suggest that the proposed 30 dry tons/acre rate would pose any greater environment or public health hazard than the 6 dry tons/acre rate.

Plaintiffs note that, Lawther, the state hydrogeologist, and Ernest Spencer, head of the Sewage and Sludge Section of the Waste Management Administration, testified that nitrogen content of the sludge and its potential to migrate into groundwater were issues that would have been considered in the review of an application for a permit in 1981 (Paper No. 36, Lawther Dep. at 21–22; Spencer Dep. at 16–17). Lawther also testified that it was the normal course of processing a permit at that time that a heavy metals calculation be made (*id.*, Lawther Dep. at 60–61). Plaintiffs argue that defendants had already examined the permit application in connection with these issues and had concluded that the issuance of the permit would pose no danger to the environment or public health.

After being issued the permit on December 15, 1981, for an application rate of 6 dry tons/acre, Freeman, Inc. immediately

filed an application for a permit for an additional 24 dry tons/acre to reach the 30 dry tons/acre figure. In a letter dated December 22, 1981, William Chicca of DHMH advised Sfekas that the application for additional sludge disposal had been received and that "[b]arring any unforeseen circumstances, we expect that we will be able to process your application and either grant, deny, or grant with conditions a permit by March 1, 1981 [sic]" (Paper No. 31, Sfekas Aff., ¶ 17 and Exh. C). (It appears that the March 1, 1981 date is a typographical error which should read March 1, 1982).

Eichbaum states that, after issuing the permit authorizing application at the rate of 6 dry tons/acre, he directed members of his staff "to investigate questions about the sludge program and the possibility of imposing a moratorium on the placement of Back River sludge on agricultural land," whereupon he was "advised by [his] staff that there were unanswered policy and technical questions relating to the subject" and was advised by counsel for DHMH "that the Secretary had authority to establish a moratorium." (Id., Eichbaum Aff., ¶ 8).

On December 24, 1981, the DHMH issued a press release announcing "a moratorium on the use of Back River sewage sludge on productive agricultural land until March 1, 1982." (Id., Exh. 5). The press release continued:

"The moratorium, which does not affect projects already under permit, will provide the opportunity for a forum of scientists, under the leadership of the Department's Dr. Max Eisenberg, to discuss and make recommendations regarding the efficacy of using Back River sludge on agricultural land. Participation will be sought from scientists within such agencies as the United States Environmental Protection Agency (EPA), the United States Food and Drug Administration (FDA), the United States Department of Agriculture (USDA) and the University of Maryland Agronomy Department."

(Id., Exh. 5). The press release noted an expected resolution of the problems by March 1, 1982.

Sfekas states that the moratorium had the effect of denying Freeman's application for a permit and that it was his "impression" at the time that the moratorium was issued for the sole purpose of denying Freeman its permit (Paper No. 31, Sfekas Aff., ¶ 17).

By December, Freeman, Inc. was experiencing severe cash flow problems. Although Freeman began application of Back River sludge at the Middletown Road site under the 6 dry tons/acre permit, doing so from December 28 through December 31, 1981, this permit was permanently suspended on January 8, 1982 (Paper No. 23, Testimony of Freeman from April 27, 1982, at 110–120). Freeman, Inc. contested the grounds asserted for the permit's suspension. In addition, Freeman, Inc. received a complaint from DHMH in connection with the Boring site on the ground that the site had not been mulched and tacked. Although directed by DHMH to take corrective action at the Boring site by applying straw mulching and tacking it down, Freeman, Inc. was financially unable to undertake this action.

The Scientific Forum issued its report in February 1982, in which it concluded that:

"The use of Back River sludge poses no greater public health or water pollution risks than other municipal sludges if present site loading criteria and recommended soil management practices are employed. Back River sludge does, however, contain higher levels of zinc, copper, and nickel than typical municipal sludges and its use on agricultural land will raise total site loadings of these metals more quickly than other sludges, thereby reducing future soil amendment options available to the farmer. In view of this consideration, its placement on agricultural land could not be considered as a good agricultural management practice."

(Paper No. 31, Exh. 4). It also concluded, however, that sludge application rates on

farmland cannot be adequately controlled when sludge is placed in fields and spread by course application methods such as bulldozers, the method which Freeman proposed to use. With respect to the use of Back River sludge on agricultural land, the report concluded that Back River sludge contains higher levels of zinc, copper, and nickel than many other municipal sludges in Maryland, in levels exceeding those recommended in the University of Maryland's guidelines for acceptable sludge quality, and that while these higher concentrations of heavy metals did not pose any human health or water pollution risks, they did present potential phytotoxic effects. Thus, the report stated that the application of Back River sludge was not a good agricultural management practice. Relying on this report, DHMH extended the moratorium on the use of Back River sludge until December 31, 1982.

Nevertheless, DHMH did, on March 15, 1982, rule on Freeman, Inc.'s application of December 15, 1981 for a permit to apply an additional 24 tons/acre of sludge to the Middletown site. Based on the uncorrected site violations at the Boring and Middletown sites, however, DHMH denied the application, concluding that the violations established "a pattern of non-compliance with permit provisions." (Paper No. 23, Eichbaum Aff., ¶ 12).

Freeman appealed this denial to a Hearing Examiner, and after losing, to the DHMH's Board of Review. In May 1982, the DHMH's Board of Review reversed the denial and ordered that DHMH issue the permit. According to plaintiffs, however, by this time the company's financial condition no longer permitted it to conduct any business (Paper No. 31, Freeman Aff., ¶ 23; Sfekas Aff., ¶ 18).

In addition, there is evidence that, during this period, there was legislation before the Maryland State Legislature which would have required a public hearing prior to the issuance of permits for sewage sludge disposal and that DHMH was opposed to such legislation (Paper No. 31, Exh. 1). There is no evidence, however, apart from plaintiffs'

allegations, which suggests that this played any part in the denial of Freeman's application.

## II. *Legal Analysis*

### A. *Qualified Immunity*

The parties in the present case disagree on the extent to which an official's subjective motivation in performing a discretionary act is pertinent to a defense of qualified immunity. Defendants argue that, following *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), and *Mitchell v. Forsythe*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), an official's subjective motivation must not be considered. Rather, defendants assert, the court must look solely at whether the official's actions violated clearly established constitutional standards of which a reasonable person should have known. Plaintiffs argue, on the other hand, that this court must consider the motives of defendants in performing their actions to determine whether the articulated reasons stated by defendants as justifying their actions are merely pretextual, and to determine whether defendants' actions were actually based on improper considerations. Thus, plaintiffs argue that the defendant officials' subjective motivation in denying plaintiffs' permit application is a crucial issue of fact to be decided by the jury.

In *Harlow v. Fitzgerald*, plaintiff alleged that his constitutional rights had been violated by defendants who, acting in their capacities as aides to President Nixon, were alleged to have entered into a conspiracy which resulted in plaintiff's dismissal from his position as a management analyst with the Department of the Air Force. After holding that such officials were not entitled to absolute immunity, the Supreme Court analyzed the application of qualified immunity.

Quoting *Butz v. Economou*, 438 U.S. 478, 507–08, 98 S.Ct. 2894, 2911–12, 57 L.Ed.2d 895 (1978), the Court noted that the standard for qualified immunity is assumed to "permit '[i]nsubstantial lawsuits [to] be quickly terminated.'" 457 U.S. at

814, 102 S.Ct. at 2736. The Court discussed the "objective" and "subjective" aspects of qualified or "good faith" immunity, as set out in *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1000, 443 L.Ed.2d 214 (1975), and noted that:

> "The subjective element of the good-faith defense frequently has proved incompatible with our admonition in *Butz* that insubstantial claims should not proceed to trial. Rule 56 of the Federal Rules of Civil Procedure provides that disputed questions of fact ordinarily may not be decided on motions for summary judgment. And an official's subjective good faith has been considered to be a question of fact that some courts have regarded as inherently requiring resolution by a jury."

457 U.S. at 815–16, 102 S.Ct. at 2737 (footnotes omitted). In order to prevent broadranging discovery inherent in a judicial inquiry into an official's subjective motivation, the Court concluded that such determinations should be made on the basis of the objective reasonableness of the official's actions in light of clearly established law.

> "Consistently with the balance at which we aimed in *Butz,* we conclude today that bare allegations of malice should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery. We therefore hold that government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. See *Procunier v. Navarette,* 434 U.S. 555, 565 [98 S.Ct. 855, 861, 55 L.Ed.2d 24] (1978); *Wood v. Strickland,* 420 U.S., at 322 [95 S.Ct. at 1000].

> Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment. On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful. Until this threshold immunity question is resolved, discovery should not be allowed. If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct. . . .

> By defining the limits of qualified immunity essentially in objective terms, we provide no license to lawless conduct. The public interest in deterrence of unlawful conduct and in compensation of victims remains protected by a test that focuses on the objective legal reasonableness of an official's acts. Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action. But where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken 'with independence and without fear of consequences.' *Pierson v. Ray,* 386 U.S. 547, 554, [87 S.Ct. 1213, 1217, 18 L.Ed.2d 288] (1967)."

457 U.S. at 817–19, 102 S.Ct. at 2738–39 (footnotes omitted).

The findings of *Harlow* were recently reaffirmed by the Supreme Court in *Mitchell v. Forsyth,* 105 S.Ct. 2806, in which the Court noted that in *Harlow* "this Court purged qualified immunity doctrine of its subjective components." 105 S.Ct. at 2810–11. The nature of the present case, however, makes a straightforward application of the *Harlow* doctrine problematic.

■ In the present case, in order for defendants to be entitled to qualified immunity under *Harlow*, they must show that their actions in delaying the issuance of the permit did not violate any clearly established statutory or constitutional rights then in existence of which a reasonable person would have known. In this case, plaintiffs allege that the delay in issuing the permit was unjustified and that defendants actually based their actions on motives which were improper under clearly established law, but put forth pretextual reasons purporting to justify their actions. The only factual question related to the issue of qualified immunity which appears to be in dispute is, as plaintiffs state, "whether [d]efendants were carrying out their duties according to clearly established practice or whether they merely articulated reasons to hide their true motives." (Paper No. 36 at 9–10).

A literal application of the rule expressed in *Harlow* would require this court to ignore defendants' subjective motives and to look solely at whether defendants' actions were objectively reasonable under clearly established law. If so, then defendants would be entitled to summary judgment. Such an application has been criticized, however, where, as here, the allegedly improper subjective motivation of the official in carrying out his duties is an essential component of the plaintiff's claim. Note, *Qualified Immunity for Government Officials: The Problem of Unconstitutional Purpose in Civil Rights Litigation*, 95 YALE L.J. 126 (1985) (hereinafter cited as Note, *Qualified Immunity*). To completely foreclose any inquiry into the official's subject motivation in such cases would unfairly deprive potential victims of constitutional abuses of a remedy in a manner which this court is of the opinion the *Harlow* Court did not intend. *See* Note, *Qualified Immunity*, 95 YALE L.J. at 137–41.

This court believes that a two-step process should be applied to such cases in determining whether government officials should prevail on qualified immunity grounds. This process should conform to the language in *Mitchell v. Forsyth* that:

"Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery. [*Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738.] Even if the plaintiff's complaint adequately alleges the commission of acts that violated clearly established law, the defendant is entitled to summary judgment if discovery fails to uncover evidence sufficient to create a genuine issue as to whether the defendant in fact committed those acts. *Harlow* thus recognized an entitlement not to stand trial or face the other burdens of litigation, conditioned on the resolution of the essentially legal question whether the conduct of which the plaintiff complains violated clearly established law."

105 S.Ct. at 2816.

Where the defendant official's state of mind is an essential component of the alleged constitutional violation, the court should, prior to discovery, first determine whether the plaintiff has alleged facts with respect to the official's subjective intent which, if proved, constitute a violation of clearly established law. *See* Note, *Qualified Immunity*, 95 YALE L.J. at 144–45. If so, the parties should proceed to discovery; but if not, the action should be dismissed. Such a review should prevent premature dismissal of potentially meritorious claims where an official has articulated a facially valid but pretextual reason for action based in reality on improper motives.

■ Second, after the parties have conducted discovery, the court should re-examine a defendant's qualified immunity claim on summary judgment to determine whether the evidence is sufficient to create a genuine issue as to whether the defendant in fact committed the acts based on motives which violated clearly established law. Although, as plaintiffs argue, questions involving motive, intent or state of mind are generally inappropriate for resolution on summary judgment, *e.g., Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th

Cir.1979), the *Harlow* Court took this into account, *Harlow v. Fitzgerald,* 457 U.S. at 815–17, 102 S.Ct. at 2736–38, in reaching its conclusion that the qualified immunity doctrine should be applied on summary judgment, even in such cases, so as to avoid excessive disruption of government and permit the resolution of insubstantial claims on summary judgment.

■ To this end, this court finds that the following procedure should be applied in determining summary judgment motions on the issue of qualified immunity in cases where the official's subjective intent is an essential component of the plaintiff's claim. Initially, the court should determine whether there is any direct evidence that the official's actions were improperly motivated. If so, the case should proceed to trial. If, however, there is no direct evidence, but only inferences, that the officials actions were improperly motivated, the court should determine whether there is any evidence to support the stated basis for the official's decision, *i.e.,* whether there is any evidence upon which the official could have rationally decided to take the challenged action for the reason which the plaintiff claims is pretextual. If so, this court should not second-guess the official, and the official is entitled to qualified immunity. If not, then the official's motive is still a genuine issue, and the case should proceed to trial.

In resolving summary judgment motions in such cases in this way, this court is optimistic that the appropriate balance will be reached between the legitimate interests of individuals treated unfairly by government officials to bring their claims to trial, and the competing interests of the government to avoid the excessive disruption of government caused by defending insubstantial claims. This court is also satisfied that such a procedure is in accord with the views of the Supreme Court as expressed in *Harlow* and *Mitchell.* For example, in *Mitchell,* the Court rejected respondent's argument that even if the district court had incorrectly concluded that the warrantless national security wiretaps violated clearly established law, Mitchell was not entitled to summary judgment because the lower court had never expressly found that his actions were in fact motivated by a concern for national security. *Mitchell v. Forsyth,* 105 S.Ct. at 2820–21, n. 13. The Court found that the district court had, in fact, taken Attorney General Mitchell at his word that the wiretap was a national security interception. The Supreme Court noted that, had the district court not so concluded, the wiretap would clearly have been illegal under Title III and qualified immunity would not have been available to be considered, as it was, by the district court. *Id.* The Court therefore concluded that the consideration by the district court of the issue of qualified immunity precluded any suggestion that the wiretap was authorized for some purpose unrelated to national security. *Id.* The Court, then, implicitly recognized the potential significance of an official's motivation in the resolution of a defense of qualified immunity.

■ In the present case, the DHMH is granted power to issue permits for the disposal of sewage sludge under *Md.Ann. Code* art. 43, § 394 (1957 and 1981 cum. supp.).[2] Pursuant to § 394, the DHMH

---

2. Section 394 provides:

"(a) After April 16, 1914, the State, a county municipality, district, corporation, company, institution, or person may not install a system of water supply, sewerage or refuse disposal, for public use, nor materially alter or extend any such existing system, without having received a written permit from the Secretary of Health and Mental Hygiene so to do. In addition, permit for this purpose may not be issued until complete plans and specifications for the installation, alteration or extension, together with any information as the Secretary of Health and Mental Hygiene may require, have been submitted and approved by the Secretary of Health and Mental Hygiene. All construction shall take place in accordance with the approved plans. In case it becomes necessary or desirable to make material changes in plans or specifications, the changed plans or specifications, together with a statement of the reasons for the alterations, shall be submitted to the Secretary of Health and Mental Hygiene, and no material changes shall be embodied in the actual construction until they are approved by the Secretary of Health and Mental Hygiene and a permit

issued regulations governing such permits. Code of Maryland Regulations (COMAR) § 10.17.10.04A requires applications for permits to be accompanied by sufficient information to enable the Department to review the proposed project to determine if its implementation is consistent with Maryland laws and regulations relating to the protection of public health and safety. In addition, COMAR § 10.17.10.05A provides that the DHMH may issue permits for projects involving land utilization and disposal "[w]hen the Department has determined that the nature of the sewage sludge and method of operation are such that public health hazards, deleterious effects on environmental health, or health nuisances will not result." (Paper No. 36, Exh. 2). In addition, the Division of Solid Waste Control of DHMH had Guidelines for the Utilization and Disposal of Sewage Sludge and the Municipal Waste Division of DHMH had Sewage Sludge Procedures for Approval, both of which have been submitted by plaintiff (Paper No. 36, Exhs. 3 and 4).

It appears that the authority of the DHMH has been interpreted to be quite broad. *See American Recovery Co. v. Department of Health and Mental Hygiene*, 306 Md. 12, 18–19, 506 A.2d 1171 (1986) (finding that the DHMH may assess a civil penalty for a violation of the State's hazardous waste laws even absent any finding that the violation caused actual harm to the environment); *State Department of Health and Mental Hygiene v. Congoleum Corp.*, 51 Md.App. 257, 443 A.2d 130, *cert. denied*, 293 Md. 615 (1982) (finding that the DHMH had authority to compel a corporation to submit and comply with a pest control program for its waste water disposal system, even where there was no finding of a danger to the public health nor any allegations that the purity of the waters of the State was being affected). Also, there is no question that under proper circumstances, the Secretary of the DHMH has the authority to issue moratoria. *Wincamp Partnership v. Anne Arundel Co.*, 458 F.Supp. 1009 (D.Md.1978); *Smoke Rise, Inc. v. Washington Suburban Sanitary Commission*, 400 F.Supp. 1369 (D.Md. 1975).

At this stage of the proceedings, plaintiffs continue to allege that defendants delayed issuance of the permit on the basis of illegitimate political reasons. Nevertheless, despite having conducted discovery plaintiffs have presented no direct evidence to support these allegations.[3] In order to prevail, plaintiffs would have to prove that defendants did not believe, or had no reasonable basis to believe, that granting the permit could have been harmful to the public health or the environment. Plaintiffs have produced no direct evidence that defendants did not so believe. The only evidence which arguably supports plaintiffs' claims are inferences which could be drawn

issued for them. After completion of the work a certified copy of the plans in full, showing the work as built, shall be filed with the Secretary of Health and Mental Hygiene for permanent record. The Secretary of Health and Mental Hygiene may make and enforce such rules and regulations regarding the submission of plans for approval and record as he may deem reasonable and proper. Before plans are drawn, or application filed, for a prospective system of water supply, sewerage or refuse disposal, a preliminary statement concerning the improvement may be made to the Secretary of Health and Mental Hygiene whereupon if requested, he shall outline the general requirements of the case conformity with which would meet with his approval. When application is made to the Secretary of Health and Mental Hygiene for a permit under the provisions of this section, it shall be the duty of the Secretary of Health and

Mental Hygiene to examine the application without delay, and, as soon as possible after submission of the application, to issue the permit, disapprove the application, or state the conditions under which the permit will be granted.

(b) An individual or corporation for commercial purposes and a municipality, county, district, or institution may not engage in collection, handling, burning, storage, or transportation of sewage sludge without first obtaining a permit from the Secretary of Health and Mental Hygiene. He shall adopt appropriate rules and regulations relating to permissible uses and methods of collection, handling, burning, storage and transportation of sewage sludge."

3. In addition, this court on two occasions extended the time for discovery to permit plaintiffs additional time.

that defendants did not actually believe that there existed the possibility of harm. State officials testified that when the permit application was originally reviewed by the DHMH, the possibility of nitrate contamination of groundwater and the possibility of adverse effects to the environment as a result of high heavy metals content would have been taken into consideration. Nevertheless, the technical staff of the DHMH had concluded originally that issuance of the permit presented no danger to the public health or the environment. From such testimony, one could infer that the defendants did not believe and could not reasonably have believed that any potential danger existed.

On the other hand, the citizens and legislators opposing issuance of the permit submitted materials which were purportedly supported by scientific data, in which it was alleged that serious deleterious effects could result to the environment from approval of the permit. As discussed *supra,* it appears that all of the opposition to approval of the permit by citizens and legislators was based on their contentions that there existed serious unanswered questions concerning the effect on the public health and the environment from application of Back River Sewage sludge on the Middletown Road site as proposed.

Although the DHMH's technical staff had reviewed the permit, the Citizen Input Paper asserted that considering the amount of sludge proposed to be applied—48 dry tons/acre—an extremely large amount of excess nitrogen would be present, which would almost assuredly result in contamination of groundwater (Paper No. 36, Exh. 6 at 8). The paper's assertions were supported by statements in EPA Publication MCD–33, *Application of Sewage Sludge to Cropland: Appraisal of Potential Hazards of the Heavy Metals to Plants and Animals,* which states:

> "It is well known that nitrogen which leaches below the root zone will be in the nitrate form, and eventually this nitrate may contaminate ground water supplies. For this reason, it is advisable to gear

sludge applications to supply sufficient but not excessive nitrogen for crop needs."

(Defs' Hearing Exh. No. 1 at 16). EPA Publication No. MCD–35, *Application of Sludge and Wastewaters on Agricultural Lands: A Planning and Educational Guide,* also recommends that the annual rate of sludge application be consistent with the nitrogen requirements of the crop grown (Defs' Hearing Exh. No. 1A at 3.11, 4.1).

In addition, Guidelines for the Utilization and Disposal of Sewage Sludge of the DHMH's Division of Solid Waste Control states that:

> "Application of sludge to agricultural lands which may be used to grow crops must be accomplished so as to ensure cropland resources are protected and harmful contaminents are not concentrated in the human food chain."

(Paper No. 36, Exh. 3 at 7–8). With respect to application rates, it states (giving the then-present policy of the University of Maryland Department of Agronomy) that "[t]he annual rate of sludge application on productive farm land should be determined according to the nitrogen requirement of the crop." (*Id.,* Exh. 3 at 11). Even the report filed by Metcalf & Eddy, Inc., the consulting firm hired by Freeman, recommended sludge application rates which were considerably lower—17 to 26 dry tons/acre—than that requested in Freeman's application—48 dry tons/acre (Paper No. 36, Exh. 5 at 2–3).

The record here contains sufficient evidence to provide a rational basis for the claim of the defendants that approval of the permit was delayed because there existed unanswered questions concerning the effect of such sludge application on the public health and the environment. It also appears from the Guidelines of the Solid Waste Division, quoted above, that the DHMH considered protection of cropland resources to be within the domain of its authority. Plaintiffs have presented no evidence that such is not within the DHMH's authority. In light of the findings of the

Scientific Forum that the use of Back River sewage sludge could present phytotoxic effects, and therefore could not be considered a good agricultural management practice, the moratorium was justified under the DHMH's apparent belief that they possessed authority to protect cropland resources.

In addition, despite the previous review by the technical staff at the DHMH, their approval of the permit appears to conflict directly with the recommendations in the Guidelines and in EPA Publications MCD–33 and MCD–35. Eichbaum could rationally have had some question as to whether his staff was properly executing its responsibilities. In summary, the record provides a factual underpinning sufficient to establish a rational basis for the actions of the defendants in delaying issuance of the permit, in limiting issuance of the permit to an application rate equal to the nitrogen uptake of the crop of sod—6 dry tons/acre—until further answers to the questions could be obtained, and in imposing the moratorium until the Scientific Forum could issue its findings. In such a situation, defendants are entitled to qualified immunity.

The standard which must be applied by this court in deciding a motion for summary judgment is the same standard as for deciding a motion for directed verdict under Rule 50(a), Fed.R.Civ.P. *Anderson v. Liberty Lobby, Inc.,* —— U.S. ——, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "The mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.,* 106 S.Ct. at 2512.

Here, the evidence supports a finding that defendants had a rational basis for taking the actions which they took. Plaintiffs have presented no evidence from which a reasonable jury could find that defendants did not have a rational basis for their actions. Therefore, there is no genuine issue for trial, and summary judgment must be granted in favor of defendants. A separate Order to that effect will be issued.