Brett C. KIMBERLIN, Appellee,

v.

Michael J. QUINLAN, et al., Appellants.

No. 91–5315.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 16, 1992.

Decided Oct. 8, 1993.

Robert M. Loeb, Attorney, U.S. Dept. of Justice, argued the cause for the appellants. On brief were Jay B. Stephens, U.S. Atty. at the time the briefs were filed, Stuart M.

Gerson, Asst. Atty. Gen., and Barbara L. Herwig, Attorney, U.S. Dept. of Justice.

Howard T. Rosenblatt argued the cause for appellee.

Jane E. Kirtley filed the brief for amicus curiae Reporters Committee for Freedom of the Press.

David H. Remes and Arthur B. Spitzer filed the brief for amicus curiae American Civil Liberties Union of the Nat. Capital Area.

Before EDWARDS, WILLIAMS and HENDERSON, Circuit Judges.

Opinion for the court filed by Circuit Judge KAREN LECRAFT HENDERSON.

Separate concurring opinion filed by Circuit Judge STEPHEN F. WILLIAMS.

Dissenting opinion filed by Circuit Judge HARRY T. EDWARDS.

KAREN LECRAFT HENDERSON, Circuit Judge:

[1] Brett C. Kimberlin, a federal prisoner, brought this action against J. Michael Quinlan, Director of the Bureau of Prisons (Bureau), Loye W. Miller, Jr., Director of Public Affairs at the Department of Justice (Department), and the United States. The complaint alleged Quinlan and Miller, in their individual capacities, conspired to violate and in fact violated Kimberlin's rights under the first and fifth amendments to the United States Constitution by denying him, respectively, access to the press and due process of law. In addition, the complaint charged the United States and Quinlan in his official capacity with the torts of assault and battery and with violating title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2511. The district court dismissed the tort claims in part[1] and the fifth amendment claims in toto but left intact the first amendment and title III claims. See Kimberlin v. Quinlan, 774 F.Supp. 1 (D.D.C. 1991). Quinlan and Miller now appeal the district court's denial of their motions for

1. Kimberlin alleged claims of assault, battery and false imprisonment. The district court dismissed the first two, but not the third, for improper venue.

dismissal or summary judgment on the first amendment claims, alleging they are entitled to qualified immunity from liability on those claims.[2] For the following reasons we conclude the appellants are entitled to qualified immunity and, accordingly, reverse the district court's decision and remand with direction to enter summary judgment in their favor on the first amendment claims.

The circumstances giving rise to Kimberlin's claims are largely undisputed. Sometime before the November 8, 1988 presidential election, while incarcerated· at the El Reno Federal Correctional Institution (El Reno) in El Reno, Oklahoma,[3] Kimberlin announced to members of the news media that he had sold marijuana to Dan Quayle, the Republican candidate for Vice President, when Quayle was a law student in the early 1970s. On November 3, the Thursday before the election, NBC News contacted El Reno authorities and requested an interview with Kimberlin. The Bureau's Central Office in Washington, under pressure from NBC News, directed that the interview be expedited in order to occur before the election. Accordingly, the interview was conducted on Friday November 4.[4] On either Thursday or Friday, an official at the Bush/Quayle Campaign, having learned of the situation from other sources, telephoned the Bureau "for additional information" and was informed of the interview. Memorandum from Quinlan to Francis A. Keating, II, Associate Attorney General (Keating Memorandum) at 4.[5]

Other interview requests followed and, according to Carolyn A. Sabol, Regional Counsel for the Bureau's South Central Regional Office, "the Acting Warden suggested that a joint interview be set up to reduce the strain on institution resources of handling each interview separately." June 19, 1990 Letter from Sabol to Howard T. Rosenblatt, Counsel for Brett C. Kimberlin (Sabol Letter). Accordingly, R.C. Benefiel, executive assistant to the El Reno warden, told Kimberlin that "he would set up a 'press conference' for that evening at 7:00." Oct. 30, 1990 Declaration of Brett C. Kimberlin (Kimberlin Declaration) at 2. Mark Goodin, Deputy Press Secretary for the Bush/Quayle campaign, learned of the impending press conference from a reporter and telephoned Miller to say he was "amazed" that Kimberlin was to hold a press conference. Oct. 16, 1990 Deposition of Mark W. Goodin 73. Miller responded "Well, amazed or not, he's going to have one. It's within his rights to have one according to the rules and regulations." *Id.*

Late in the afternoon of November 4, Quinlan ordered the press conference cancelled because, as he put it, "[t]he Bureau's policy on media access permits individual media contacts by inmates, as well as small press pools under specialized circumstances, but does not authorize inmate press conferences." Keating Memorandum at 3. Quinlan apparently maintained a consistent policy against press conferences by prisoners. *See* Aaron Freiwald, *Isolation for Inmate with Quayle Claims,* Legal Times, Dec. 19, 1988, at 10 ("Quinlan ... notes that he has not allowed a prison press conference since he became director of the bureau late last year.").[6]

---

**2.** Denial of a summary judgment motion based on qualified immunity is immediately reviewable by interlocutory appeal. *Mitchell v. Forsyth,* 472 U.S. 511, 524–30, 105 S.Ct. 2806, 2814–18, 86 L.Ed.2d 411 (1985).

**3.** Kimberlin is serving a fifty-one year sentence for drug- and explosives-related charges.

**4.** NBC News ultimately declined to broadcast the story.

**5.** The exact date of the call is unclear as Quinlan placed it on "Friday, November 3rd," misidentifying either the day of the week or the date. Keating Memorandum at 4.

**6.** The Bureau's regulations set out procedures for personal interviews, 28 C.F.R. § 540.63 (1988),

and press pools in which one representative from each news medium participates, 28 C.F.R. § 540.64 (1988), but make no mention of press conferences. While Kimberlin does not challenge the regulations' validity, he does assert that because they do not prohibit press conferences he was entitled to hold one. The logic of Kimberlin's sub silentio argument eludes us. That which the regulations authorize is authorized; conversely what they do not authorize is not authorized. Further, the regulations provide that "[a]ny questions as to the meaning or application of this subpart are resolved by the Director of the Bureau of Prisons." 28 C.F.R. § 540.61(g). Quinlan has, as noted, apparently consistently exercised his discretion under this provision to prohibit prisoner press conferences and to limit inmates' press access to the more

At approximately 11:30 p.m. on November 4 Kimberlin was placed in administrative detention at Quinlan's direction. Sabol Letter at 3. The administrative detention order entered by the El Reno prison officials on November 4 recited as the reason for detention that Kimberlin "stated to the National news media this [sic] his life is in danger." November 4, 1988 Detention Order. A contemporaneous memorandum from Benefiel to Kimberlin's file stated that J.D. Williams, the Bureau's South Central Regional Director, had telephoned to report that a radio reporter had informed Miller that Kimberlin "feared retaliation and had fear for his safeth [sic]." November 4, 1988 Memorandum from R.C. Benefiel to Investigative File. The memorandum further noted that "the evening watch lieutenant ... had been receiving information that inmates on the compound were saying that if Kimberlin will snitch on Quale [sic] he will do the same to us." *Id.* Benefiel's memorandum concluded: "Based upon the information about his being called a snitch and the telephone call from Mr. Williams it was decided that to insure the inmates [sic] safety he would be placed in administration detention until the matter could be throughly [sic] investigated by investigative staff. I directed the evening watch to make such placement." *Id.*

The following day, while Kimberlin was still in detention, Miller received another telephone call from Goodin who "noted the obvious: that the closer to the Tuesday election that the story were to break, the more attention it was likely to get, and the better the chance that it could have at least some adverse effect on the Bush–Quayle chances." October 11, 1989 Memorandum from Miller to Whom it May Concern (Miller Memorandum) at 4. Miller noted, however, that "Goodwin [sic] did not try in any way to influence the department's handling of Kimberlin." *Id.* Goodin himself denied seeking or receiving any "reassurances" from Miller, Goodin Deposition at 73, or ever speaking with anyone at the Bureau, *id.* at 90. In addition, Quinlan stated the Bureau received

only a single call from the Bush/Quayle campaign regarding Kimberlin, the one described above, and that "[a]t no time during the entire period from Thursday, November 3rd through Election Day did anyone from the Bush/Quayle campaign ask or instruct the Bureau of Prisons to do anything with regard to this matter." Keating Memorandum at 4. Around 7:30 that evening, Kimberlin was released from detention after an investigation revealed no threat to his safety and "Kimberlin specifically stated he did not perceive a threat." Sabol Letter at 3.

On November 7, Kimberlin was again placed in administrative detention, this time, according to the Bureau, for violating a Bureau regulation prohibiting any prisoner from making a third-party telephone call, that is, a call placed to one party who electronically transfers it to another party. November 7, 1988 Incident Report; *see* 28 C.F.R. § 540.104 (1988) ("Third party billing and electronic transfer of a call to a third party are not permitted."). According to El Reno records, the third-party call occurred on November 4 when Kimberlin telephoned a friend who in turn connected him through a conference call to a lawyer for the Democratic National Committee. Nov. 14, 1988 Disciplinary Hearing Officer Report 2. The same records noted that Kimberlin admitted making the call but denied knowing it was proscribed. *Id.* He was found guilty of the violation after a hearing on November 14 and was released later that day. *Id.*

Kimberlin was placed in detention for a third time on December 22, according to the Bureau, for again violating the third-party telephone prohibition. Local prison officials released Kimberlin on December 23 and found him not guilty because there was "no specific evidence that [Kimberlin] intentionally placed a conference/third-party call." January 9, 1989 Incident Report. This detention occurred a few days after news stories appeared describing Kimberlin's problems with prison officials and one day after Kimberlin

---

manageable settings expressly authorized under the regulations. To the extent that this policy may impinge on a prisoner's first amendment rights, it is nevertheless valid as "reasonably

related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987).

had conducted two telephone interviews. Kimberlin Declaration at 4.

As previously noted, the foregoing facts are not in dispute. What is vigorously contested is the motivation for Kimberlin's three detentions. Kimberlin alleges the first two detentions were ordered to deny him access to the press while the third was in retaliation for his media interviews. The appellants, on the other hand, maintain that the detentions were ordered for the reasons set out above: the first to ensure Kimberlin's safety and the later two on account of the third-party call infractions. Specifically, they claim they are entitled to qualified immunity from suit because their actions were objectively reasonable under the facts as established in the record. We agree.

In *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court established an objective test for qualified immunity under which "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.,* at 818, 102 S.Ct. at 2738. Since then the Court has made it clear that qualified immunity should be granted, and suit dismissed, where the plaintiff "not only failed to allege the violation of a constitutional right that was clearly established at the time of the [defendant's] action, but ... failed to establish the violation of any constitutional right at all." *Siegert v. Gilley,* 500 U.S. 226, ——, 111 S.Ct. 1789, 1794, 114 L.Ed.2d 277 (1991). The Court has emphasized that qualified immunity is "an *immunity from suit* rather than a mere defense to liability," *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985), and that "[o]ne of [its purposes] is to spare a defendant not only unwarranted liability, but unwarranted demands customarily imposed upon those de-

fending a long drawn out lawsuit." *Siegert v. Gilley,* 500 U.S. 226, ——, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). Thus, it "ordinarily should be decided by the court long before trial," *Hunter v. Bryant,* —— U.S. ——, ——, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991), "at the earliest possible stage in litigation," *id.,* at ——, 112 S.Ct. at 536, and "such pretrial matters as discovery are to be avoided if possible, as '[i]nquiries of this kind can be peculiarly disruptive of effective government.'" *Mitchell v. Forsyth,* 472 U.S. at 526, 105 S.Ct. at 2815 (quoting *Harlow,* 457 U.S. at 817, 102 S.Ct. at 2737–38).

Because of the special immunity accorded government officials who act in an objectively reasonable manner, this court has established a "heightened pleading" standard for a plaintiff like Kimberlin who sues government officials and alleges unconstitutional motive. Ordinarily, "[u]nder Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law'" so that entry of summary judgment is "mandated" "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56).[7] We impose a more stringent standard, however, on a plaintiff who charges a government official with a constitutional deprivation where the outcome depends on the official's state of mind. Such a plaintiff is subject to this circuit's so-called "heightened pleading" standard, requiring pleading of specific *direct* evidence of intent to defeat a motion to dismiss and subsequent production of such evi-

---

**7.** As noted above, Miller's and Quinlan's motion was one for, alternatively, dismissal or summary judgment. Because the parties submitted and the district court considered materials outside the pleadings, we treat the motion as one for summary judgment. *See* Fed.R.Civ.P. 12(b) ("If, on a motion asserting the defense numbered (6)

to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56....").

dence to defeat a motion for summary judgment.[8] *See Hobson v. Wilson,* 237 U.S.App. D.C. 219, 737 F.2d 1 (1984); *Smith v. Nixon,* 807 F.2d 197 (D.C.Cir.1986); *Martin v. District of Columbia Metro. Police Dep't,* 812 F.2d 1425 (D.C.Cir.1987); *Martin v. Malhoyt,* 830 F.2d 237 (D.C.Cir.1987); *Whitacre v. Davey,* 890 F.2d 1168 (D.C.Cir.1989); *Siegert v. Gilley,* 895 F.2d 797 (D.C.Cir.1990), *aff'd on other grounds,* 500 U.S. 226, 111

S.Ct. 1789, 114 L.Ed.2d 277 (1991).[9] While refraining from adopting the direct/circumstantial distinction we employ, most other circuits have adopted some sort of "heightened pleading" standard to further the goal of qualified immunity, namely to protect government officials from the burdens of litigating "insubstantial claims," *Mitchell,* 472 U.S. at 526, 105 S.Ct. at 2815; *Harlow,* 457 U.S. at 817–18, 102 S.Ct. at 2738.[10]

**8.** When applied, as here, at the summary judgment stage, the expression "heightened pleading" is a misnomer because the enhanced standard requires a greater evidentiary showing rather than enhanced pleading. *See Elliott v. Thomas,* 937 F.2d 338, 345 (7th Cir.1991) ("[W]e deprecate the expression 'heightened pleading' and speak instead of the minimum quantum of proof required to defeat the initial motion for summary judgment."). For summary judgment, the applicable standard might better be characterized as one of "heightened production."

**9.** Recently, in *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* —— U.S. ——, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993), the Supreme Court rejected a heightened pleading standard in section 1983 suits alleging *municipal* liability but expressly noted it had "no occasion to consider whether our qualified immunity jurisprudence would require a heightened pleading in cases involving individual government officials." *Id.,* at ——, 113 S.Ct. at 1162. The Court observed that "unlike various government officials, municipalities do not enjoy immunity from suit—either absolute or qualified," *id.,* suggesting the result might be different in individual capacity actions against government officials. The Court also noted that a true heightened pleading standard, applied to a motion to dismiss based solely on the pleadings, "is impossible to square with the liberal system of 'notice pleading' set up by the Federal Rules" and particularly with rule 8(a)(2)'s requirement that " 'a complaint include only a short and plain statement that the pleader is entitled to relief,' " *id.,* at ——, 113 S.Ct. at 1163, a consideration that does not apply to a heightened standard of production at the summary judgment stage. *See supra* note 8. In any event, because the Court did not address heightened pleading in individual capacity suits, our precedent requiring that standard in such suits remains the governing law of this circuit.

**10.** *See, e.g., Dunbar Corp. v. Lindsey,* 905 F.2d 754, 763–64 (4th Cir.1990) ("We agree with the *Martin* [*v. Malhoyt*] court that a 'heightened pleading standard' is highly appropriate in actions against government officials."); *Jackson v. City of Beaumont Police Dep't,* 958 F.2d 616, 620 (5th Cir.1992) ("[T]his circuit requires that § 1983 plaintiffs meet heightened pleading re-

quirements in cases, such as this, in which an immunity defense can be raised."); *Chapman v. City of Detroit,* 808 F.2d 459, 465 (6th Cir.1986) ("It is not enough for a complaint under § 1983 to contain mere conclusory allegations of unconstitutional conduct by persons acting under color of state law. Some factual basis for such claims must be set forth in the pleadings."); *Elliott v. Thomas,* 937 F.2d 338, 344–45 (7th Cir.1991) ("[W]e think that the best solution to the conundrum is to require the plaintiff to produce 'specific, nonconclusory factual allegations which establish [the necessary mental state], or face dismissal.' Unless the plaintiff has the kernel of a case in hand, the defendant wins on immunity grounds in advance of discovery." (quoting *Siegert,* 500 U.S. at ——, 111 S.Ct. at 1795 (Kennedy, J., concurring)); *Brown v. Frey,* 889 F.2d 159, 170 (8th Cir.1989) ("Damage actions against government officials are subject to a heightened standard of pleading with sufficient precision ' "to put defendants on notice of the nature of the claim and enable them to prepare a response and, where appropriate, a summary judgment motion on qualified immunity grounds." ' *Martin v. Malhoyt,* 830 F.2d 237, 254 (D.C.Cir.1987) (quoting *Hobson v. Wilson,* 237 U.S.App.D.C. 219, 737 F.2d 1, 29 (1984))."); *Branch v. Tunnell,* 937 F.2d 1382, 1386–87 (9th Cir.1991) ("We believe a requirement that a plaintiff must put forward nonconclusory allegations of subjective motivation, supported either by direct or circumstantial evidence, before discovery may be had, satisfies *Harlow's* directive that government officials should be shielded from 'insubstantial' lawsuits, while at the same time preserving the opportunity for plaintiffs to pursue meritorious claims."); *Pueblo Neighborhood Health Ctrs., Inc. v. Losavio,* 847 F.2d 642, 649–50 (10th Cir.1988) ("We agree with the *Martin* [*v. District of Columbia Metro. Police Dep't*] court that '[t]he Supreme Court's "strong condemnation of insubstantial suits against government officials" impels the application of a standard more demanding of plaintiffs when public officer defendants move for summary judgment on the basis of their qualified immunity.' [*Martin,* 812 F.2d at 1435] (quoting *Krohn v. United States,* 742 F.2d 24, 31 (1st Cir.1984)). Where the defendant's subjective intent is an element of the plaintiff's claim and the defendant has moved for summary judgment based on a showing of the objective reasonableness of his actions, the plaintiff may avoid

In *Whitacre,* we explained the rationale for our heightened pleading standard as follows:

> Since "substantial costs attend the litigation of the subjective good faith of government officials," *Harlow,* 457 U.S. at 816, 102 S.Ct. at 2737, and since the Court stressed the need to terminate insubstantial *Bivens* [11] claims before trial, *see id.,* at 815–16, 102 S.Ct. at 2736–37, we have supplanted the liberal pleading requirements of the Federal Rules with a heightened pleading standard whenever a plaintiff in a *Bivens* claim alleges an unconstitutional motive.

890 F.2d at 1171 (citing *Malhoyt, Smith* and *Hobson* ). More recently, in *Siegert,* we clearly explained how the standard applies to a summary judgment motion based on qualified immunity:

> Where the defendant's subjective intent is an essential component of plaintiff's claim, once defendant has moved for pretrial judgment based on a showing of the objective reasonableness of his actions, then plaintiff, to avert dismissal short of trial, must come forward with something more than inferential or circumstantial support for his allegation of unconstitutional mo-

tive. That is, some direct evidence that the officials' actions were improperly motivated must be produced if the case is to proceed to trial.

895 F.2d at 801–02 (citing *Martin,* 812 F.2d at 1435); *see also Whitacre,* 890 F.2d at 1171 ("[W]e have imposed, in cases where the defendant's subjective intent is an essential part of the claim, a demanding requirement on the plaintiff in order to proceed to trial or obtain discovery. *See Martin v. District of Columbia Metro. Police Dep't,* 812 F.2d 1425, 1435 (D.C.Cir.1987). '[T]o avert dismissal short of trial, [the plaintiff] must come forward with something more than inferential or circumstantial support for his allegation of unconstitutional motive. That is, some *direct evidence* that the officials' actions were improperly motivated must be produced if the case is to proceed to trial.' *Id.* (emphasis added)."). Thus, in response to Miller's and Quinlan's motions below, Kimberlin was required to proffer *direct* evidence of unconstitutional motive on the part of the two defendants and was precluded from relying on mere circumstantial evidence. We conclude Kimberlin failed to sustain this burden.[12]

summary judgment only by pointing to specific evidence that the official's actions were improperly motivated. In some instances only the pleadings are examined, see *Hobson v. Wilson,* 237 U.S.App.D.C. 219, 737 F.2d 1, 29–30 (1984) (heightened pleading standard required to proceed to discovery), while in others, such as the present case, the information that is developed by discovery before the motion is made should also be considered, *DeVargas [v. Mason & Hanger–Silas Mason Co.* ], 844 F.2d [714,] 719 (10th Cir.1988).''); *Oladeinde v. City of Birmingham,* 963 F.2d 1481, 1485 (11th Cir.1992) ("On a related question about pleadings (whether the complaint states a claim), we want to use this opportunity to repeat that, 'in an effort to eliminate nonmeritorious claims on the pleadings and to protect public officials from protracted litigation involving specious claims we, and other courts, have tightened the application of Rule 8 to § 1983 cases.' *Arnold v. Board of Educ. of Escambia County,* 880 F.2d 305, 309 (11th Cir. 1989) (citation omitted). In pleading a section 1983 action, some factual detail is necessary, especially if we are to be able to see that the allegedly violated right was clearly established when the allegedly wrongful acts occurred."). The Fourth Circuit recently observed: "Whether the purposes of *Harlow* in discriminatory animus cases are expressed by means of qualified immunity formulation or by a requirement of height-

ened pleading is not critical. In either case, courts have sought to achieve the same purpose, namely the effectuation of the aims of qualified immunity in claims which incorporate a subjective element." *Gooden v. Howard County,* 954 F.2d 960, 970 n. 3 (4th Cir.1992) (en banc).

11. In *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the Supreme Court authorized damages actions against federal officials for constitutional torts.

12. We recognize that in one recent section 1983 case alleging unconstitutional intent a panel of this court characterized the "heightened pleading" standard simply as requiring "nonconclusory allegations" that are "sufficiently precise" and "specific and concrete enough" to put the defendants on notice of the nature of the claim and enable them to prepare a response, including a summary judgment motion based on qualified immunity grounds, without any mention of either direct or circumstantial evidence. *Crawford–El v. Britton,* 951 F.2d 1314, 1317, 1320 (D.C.Cir. 1991). The reason for this omission appears to lie in the defendant-appellant's failure to raise the distinction in her discussion of the heightened pleading standard. *See* Brief for Appellant at 12–14, *Crawford–El.* Even so, in finding the

To establish unconstitutional motive for his first detention, Kimberlin relied primarily on alleged discrepancies among the various participants' accounts of the circumstances preceding the detention. On November 4, the date of Kimberlin's first detention, Miller spoke over the telephone at least twice with the radio reporter who, according to Miller, related that Kimberlin had told her the cancellation of the press conference "led him to believe his safety was threatened by the hostile attitude of the prison authorities." Miller Memorandum 2–3. Quinlan, consistently, maintained he placed Kimberlin in detention after, and because, he learned that the reporter had "advised Loye Miller ... that she believed Kimberlin might be in some 'danger.'" Keating Memorandum at 3. The reporter, on the other hand, while admitting that an hour before his detention Kimberlin told her he "was concerned about what the Justice Department might do to him," denied having "quoted Kimberlin as saying his life was in danger." November 9, 1990 Declaration of Radio Reporter at 2. Kimberlin himself denied ever having "perceived" or "expressed" "fears that other inmates would harm [him]." Kimberlin Declaration at 3.[13] Assuming, as we must on this motion, that the reporter's recollection of her conversations is correct and that she did not relay Kimberlin's fear of the Department to Miller, her account merely disputes Miller's description of their conversations, without contradicting the affirmative evidence that Quinlan ordered the detention because of information regarding Kimberlin's safety, whether or not accurately conveyed, that he received from Miller.[14] More importantly, none of the evidence Kimberlin cites does more than cast doubt on the appellants' stated reasons for their actions—it does not constitute direct evidence that they acted out of any impermissible motive, as our circuit's heightened standard requires. Cf. St. Mary's Honor Ctr. v. Hicks, —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (title vii plaintiff does not carry burden of persuasion merely by disproving proffered explanation for firing but must affirmatively establish race as actual motivating factor).

In fact, the motive Kimberlin alleges—denying him access to the press—seems particularly unlikely since Kimberlin had already aired his allegations to NBC News and was permitted telephone contact with members of the media and others, even during his detention. See Deposition of Richard D. Acuff, Exh. 4 (handwritten notes by prison staff documenting seven calls made by Kimberlin on November 5 during his detention); November 7, 1988 Memorandum of T.C. Martin to J. Michael Quinlan (referring to "[s]even cassette tapes" containing "copies of the telephone conversation by Brett Kimberlin with numerous news media personnel, family and friends"); Sabol Letter at 3 ("Kimberlin spoke to the radio reporter "again on Saturday, November 4, 1988, while he was still in detention"). Further, the timing and tenor of Miller's conversations with the Bush/Quayle campaign belie any influence from that source. Because there is no direct evidence that Miller attempted to secure Kimberlin's detention or that Quinlan did so for any reason other than Kimberlin's safety, we conclude the district court erred in

---

plaintiff had met the standard, the Crawford–El panel expressly relied on "specific statements" by the defendant that showed her intent. Id., at 1321. In any event, the panel decision in Crawford–El did not, and could not, overrule the then established circuit requirement that a plaintiff plead or produce, depending on the stage of litigation, direct evidence of unconstitutional intent.

13. In support of his claim, Kimberlin also cites a statement by Miller that he was "pretty sure" that Kimberlin was already in detention before he spoke with the Bureau. Miller Memorandum at 4. This equivocal statement is inconsistent, however, with Miller's recollection that he telephoned the Bureau at "perhaps 11 p.m.," Id. at 2, which would have been 10:00 p.m. in El Reno, Oklahoma, a full hour and a half before Kimberlin was placed in detention.

14. Given this evidence, Quinlan acted in an objectively reasonable manner in ordering Kimberlin's detention until his safety could be assured. Prison officials have an obligation to provide prisoners with reasonable protection from foreseeable violence. See, e.g., Washington v. District of Columbia, 802 F.2d 1478, 1481–82 (D.C.Cir. 1986). Thus, given the information he received from Miller, Quinlan would have been remiss, and risked liability, had he failed to order detention and Kimberlin subsequently came to harm.

denying summary judgment as it related to Kimberlin's first detention.

▮▮▮ Kimberlin's second allegation, that the November 7 detention was also ordered to deny him access to the press, fares no better. First, Kimberlin has cited no direct evidence that either Quinlan or Miller was even involved in this detention which appears to have been ordered by local prison officials. *See* Sabol Letter at 4 ("[T]his placement in administrative detention and the one in December, 1988, were both done at the local level and did not involve any direction or consultation with staff members of the Bureau of Prisons or the Department of Justice in Washington."); Keating Memorandum at 4 ("[T]he local officials decided to place Kimberlin in detention on Monday morning. The Central Office was not involved in that decision.").[15] In addition, as already noted, it is beyond dispute that Kimberlin violated the published third-party call regulation—the reason the Bureau proffered for his second detention both contemporaneously, *see* No-

vember 7, 1988 Incident Report; November 14, 1988 Disciplinary Hearing Officer Report, and subsequently, *see* Keating Memorandum 96; Sabol Letter at 68–69. Kimberlin has come forth with no direct evidence of any other motive for this detention.[16]

Finally, the appellants are entitled to qualified immunity on Kimberlin's claim that the December 22 detention was retaliatory because the record is also devoid of any direct evidence that either appellant was involved in that detention which, according to El Reno records, was imposed by local officials for a second alleged violation of the third-party call regulation.

In sum, Kimberlin relies only on inference and weak circumstantial evidence, notably the timing of events, to support his claim of unconstitutional detention by Quinlan and Miller; he has produced no direct evidence of unconstitutional motive for any of his detentions as required under our heightened standard. Such unsubstantiated claims as Kimberlin raises are precisely the sort that both

Of course, by ordering the detention Quinlan also risked (and got) a lawsuit.

15. Kimberlin cites two newspaper articles as evidence to support Quinlan's involvement in the November 7 detention: one in the *New York Times* quoting Miller as saying "Mr. Kimberlin was twice placed in administrative detention on the order of J. Michael Quinlan, head of the Federal Bureau of Prisons," *Solitary for Quayle's Accuser,* N.Y.Times, Dec. 20, 1988, at B9, and a second in the *Legal Times* similarly quoting Miller as asserting that "[t]he Bureau of Prisons caught on that he was going to hold another press conference so they put him back in," Aaron Freiwald, *Isolation for Inmate with Quayle Claims,* Legal Times, Dec. 19, 1988, at 10. Such hearsay, however, cannot defeat a summary judgment motion. While it is not necessary that "the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment," *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2553, "normally" hearsay "would not be enough to raise an issue of fact for summary judgment purposes," *Crawford–El v. Britton,* 951 F.2d 1314, 1320 (D.C.Cir.1991). Specifically, "A third party's description of [a witness's] supposed testimony is not suitable grist for the summary judgment mill." *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir.1990). Thus, the two newspapers' characterizations of Miller's statements are useless to Kimberlin. Further, as there is no evidence that Miller was involved in or had special information about the November 7 detention, his opinion regarding who ordered it or why cannot be viewed as

direct evidence so as to satisfy our heightened standard.

16. In her June 19, 1990 letter, Sabol wrote:

On Monday, November 7, 1988, upon review of intelligence information, it was determined that Mr. Kimberlin was attempting to use the telephone to set up a press conference in Washington D.C. that morning. As a result, Mr. Kimberlin was again placed in administrative detention, to avoid a violation of our rules and protect the integrity of institution security. *Id.* at 3–4. There is nothing to suggest, however, that her explanation was based on information obtained from those involved (local officials) or even purportedly involved (Kimberlin and Miller) in the detention decision so as to constitute direct evidence of their intent.

Kimberlin also cites as evidence of improper intent that he was placed in detention before being found guilty of violating the third-party call regulation. *See* 28 C.F.R. § 541.22 (authorizing an inmate to be placed in administrative detention only (1) "when the inmate is in holdover status (i.e., en route to a designated institution) during transfer, or is a new commitment pending classification" or (2) "when the inmate's continued presence in the general population poses a serious threat to life, property, self, staff, other inmates or to the security or orderly running of the institution" and one of six enumerated conditions is also present). This evidence, however, even if probative of intent, is wholly circumstantial and would therefore be insufficient to satisfy our heightened standard.

qualified immunity and our circuit's heightened standard are intended to cut short. Accordingly, the district court's denial of the individual defendants' motion to dismiss or for summary judgment on the first amendment claims is

*Reversed and remanded.*

STEPHEN F. WILLIAMS, Circuit Judge, concurring:

I concur in the opinion of the court. When a plaintiff claims that an official enjoying qualified immunity has committed a constitutional tort involving motive, circuit precedent requires the plaintiff to proffer "direct" (as opposed to circumstantial) evidence of the illicit motive before obtaining discovery against the official. See Maj. Op. at 793–95; *Siegert v. Gilley,* 895 F.2d 797, 802 (D.C.Cir. 1990), aff'd on other grounds, 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991); *Whitacre v. Davey,* 890 F.2d 1168, 1171 & n. 4 (D.C.Cir.1989). Plaintiffs here have not met that standard. Maj. Op. at 796–98.

This is not to say that circuit law is correct. The restriction arose out of an effort to reconcile conflicting goals: to protect officials with qualified immunity from undue litigation burdens and to afford legal remedies for citizens whose rights may have been abused. *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), had framed the qualified immunity test in objective terms precisely because a rule that sheltered an official only *after* he had incurred the burdens of discovery into his motivation—a highly subjective issue—would be pretty flimsy shelter. *Id.,* at 814–19, 102 S.Ct. at 2736–39; see also *Elliott v. Thomas,* 937 F.2d 338, 344 (7th Cir.1991). In adopting the "direct" evidence rule for constitutional torts involving motive, we reasoned that *Harlow* logically required an especially high threshold showing of unconstitutional motive before defendant should be exposed to discovery. *Whitacre,* 890 F.2d at 1171.

The distinction between direct and circumstantial evidence, however, appears completely arbitrary and unrelated to the strength of the plaintiff's case. As Judge Easterbrook pointed out in *Elliott,* the requirement would

be fatal except in the rare case of the defendant's confession. 937 F.2d at 345. At the same time, while a perjured claim of having heard such a confession would meet the test, a massive circumstantial case would not. And, speaking for the Ninth Circuit, Judge Hall noted that evidence of the defendant's intent was likely to be peculiarly under his control. *Branch v. Tunnell,* 937 F.2d 1382, 1386–87 (9th Cir.1991). It is hardly surprising that the only circuits to consider our direct evidence rule have rejected it. *Elliott; Branch.* Both circuits concluded that it was enough for plaintiff to put forward specific, non-conclusory allegations, *Elliott,* 937 F.2d at 344–45; *Branch,* 937 F.2d at 1387, which we require even in cases having nothing to do with motive, see *Andrews v. Wilkins,* 934 F.2d 1267, 1269–70 (D.C.Cir.1991); *Hunter v. District of Columbia,* 943 F.2d 69, 76–77 (D.C.Cir.1991).

The simple requirement of specific, non-conclusory allegations may not be the only reasonable alternative to *Seigert.* Doubtless recognizing the vulnerability of the direct evidence rule, the Justice Department here argued a fallback position. A plaintiff could get to discovery only by making a showing of illicit intent so strong that, if the specific facts alleged were accepted as true, any reasonable jury would have to infer illicit motive. (Discovery and ultimately trial would of course be necessary to determine whether the specific allegations were true.) Appellant's Brief at 30–32. The proposal bears some resemblance to a test devised for cases where plaintiff claimed that officials with qualified immunity had conducted electronic surveillance, with lawfulness turning on whether they had done so for national security purposes. *Halperin v. Kissinger,* 807 F.2d 180, 184–85 (D.C.Cir.1986). There we said defendants' summary judgment motion should be granted if they "adduce[d] sufficient facts that no reasonable jury, looking at the evidence in the light most favorable to ... plaintiffs, could conclude that it was objectively unreasonable for the defendants to be acting for national security reasons". *Id.,* at 189; see also *id.,* at 188 (immunity defense prevails "if the facts establish that the purported national security motivation would

have been reasonable"). The rule proposed by the appellants seems more stringent than the one we adopted for a situation that combined inquiry into motive with national security concerns, so it may be logically unsustainable. If the direct evidence rule is reexamined *en banc,* however, the reconsideration should encompass alternatives.

HARRY T. EDWARDS, Circuit Judge, dissenting:

Brett Kimberlin, a federal inmate, claims in this case that the Director of the Bureau of Prisons and the Director of Public Affairs at the Department of Justice violated his First Amendment rights when they caused him to be placed in "administrative detention" to retaliate against him for trying to talk with the media. According to Kimberlin, this retaliation occurred in conjunction with the federal officials' attempts to prevent him from telling his story that he allegedly sold marijuana to former Vice President Quayle when Quayle was in law school. The majority now holds that, under a so-called "heightened pleading" standard, Kimberlin's lawsuit must be dismissed because his complaint rests on "circumstantial evidence." In my view, this result is misguided and unfair; it also stands at odds with the Supreme Court's most recent pronouncements on "heightened pleading."

On March 3, 1993, the Supreme Court held that a federal court may not apply a "'heightened pleading standard'—more stringent than the usual pleading requirements of Rule 8(a) of the Federal Rules of Civil Procedure—in civil rights cases alleging municipal liability under [42 U.S.C. § 1983 (1988)]." *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* — U.S. —, —, 113 S.Ct. 1160, 1161, 122 L.Ed.2d 517 (1993). In reaching this conclusion, the Court wrote that "it is *impossible* to square the 'heightened pleading standard'

... with the liberal system of 'notice pleading' set up by the Federal Rules." *Id.,* at —, 113 S.Ct. at 1163 (emphasis added). The Court also made it clear that a heightened pleading requirement "must be obtained by the process of amending the Federal Rules, and not by judicial interpretation." *Id.* Although the Supreme Court did not address the immunity issues present in this case, *id.,* at —, 113 S.Ct. at 1162, the rationale underlying the decision in *Leatherman*—that standards of "heightened pleading" are *fundamentally incompatible* with FED.R.CIV.P. 8(a)—casts doubt on the validity of *any* judge-made "heightened pleading" standard imposed in *any* context. *See id.,* at —, 113 S.Ct. at 1163.

Despite the strong message sent by the Supreme Court in *Leatherman,* the majority in the instant case embraces a heightened pleading standard without giving serious attention to its validity or wisdom. To make matters worse, the majority adds an insupportable gloss to the standard, distinguishing between direct and circumstantial evidence, thereby requiring *Bivens* [1] plaintiffs to plead direct, as opposed to circumstantial, evidence of unconstitutional motive, or suffer immediate dismissal of their suits. Ours is the only circuit that imposes such a requirement on civil rights plaintiffs.[2] I dissent because, even assuming that a heightened pleading standard can be valid, the majority's so-called "direct evidence rule" has no foundation in reason or in the case law.

## I. BACKGROUND

The infirmity and unfairness of the so-called "direct evidence rule" is starkly apparent in this case, in which a *Bivens* plaintiff has provided ample—albeit circumstantial—evidence that government officials twice violated his First Amendment rights. Brett Kimberlin, a federal inmate, alleges that J. Michael Quinlan, the Director of the Bureau

---

1. *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

2. Three circuits have considered and explicitly rejected a heightened pleading standard that requires the plaintiff to plead direct, as opposed to circumstantial, evidence of unconstitutional in-

tent. *Branch v. Tunnell,* 937 F.2d 1382, 1386–87 (9th Cir.1991); *Elliott v. Thomas,* 937 F.2d 338, 345 (7th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 973, 117 L.Ed.2d 138 *and cert. denied,* — U.S. —, 112 S.Ct. 1242, 117 L.Ed.2d 475 (1992); *Crutcher v. Kentucky,* 883 F.2d 502, 504 (6th Cir.1989).

of Prisons ("BOP"), and Loye W. Miller, Jr., the Director of Public Affairs at the Department of Justice ("DOJ"), violated his First Amendment rights when they caused Kimberlin to be placed in "administrative detention" to silence him and to retaliate against him for trying to tell his Quayle story to the media.[3] Although Kimberlin has not had the benefit of discovery, he has submitted to the court numerous affidavits, prison documents, newspaper articles, and memoranda written by the defendants that provide strong circumstantial evidence in support of his allegations.

The events in this case took place shortly before and after the 1988 presidential election, during which time Kimberlin was incarcerated at the federal prison in El Reno, Oklahoma. About two weeks before the election, Nina Totenberg, a journalist, received a tip that Kimberlin had sold marijuana to vice-presidential candidate Quayle when Quayle was in law school. Totenberg interviewed Kimberlin by telephone, and arranged for Kimberlin to give an affidavit verifying his story. Declaration of Nina Totenberg, *reprinted in* Joint Appendix ("J.A.") at 79, 79. Thereafter, Totenberg sent the Kimberlin affidavit to Mark Goodin, the deputy press secretary of the Bush–Quayle campaign; Goodin, in turn, then showed the affidavit to James Baker, the Bush–Quayle campaign chairman, Lee Atwater, the Bush–Quayle campaign manager, and Stuart Spencer, the Quayle campaign manager. Deposition of Mark Wayne Goodin, *reprinted in* J.A. at 97, 99–103.

At about this time, other news organizations became interested in Kimberlin's story and began requesting interviews. Prison officials in El Reno agreed to allow NBC to interview Kimberlin on November 8, 1988, election day. Not satisfied, NBC threatened to broadcast Kimberlin's allegations and run a "cover-up" story unless an earlier interview could be arranged. On Thursday, November 3, the Central Office of the BOP in Washington, D.C. asked the prison officials in El

Reno to arrange for an earlier interview. Director Quinlan later wrote in a memorandum that "Kimberlin's fundamental lack of credibility, and the likelihood of unnecessarily precipitating a 'cover-up' story just before the election, were major factors in the decision to permit the original NBC interview on an earlier schedule." Memorandum from J. Michael Quinlan to Francis A. Keating, II (Dec. 22, 1988), *reprinted in* J.A. at 93, 94.

NBC interviewed Kimberlin at the prison from 11:30 a.m. until 12:15 p.m. on Friday, November 4. Memorandum from R.C. Benefiel to Investigative File (Nov. 4, 1988), *reprinted in* J.A. at 49. Meanwhile, because prison officials had received so many requests for interviews with Kimberlin, Roger Benefiel, the Acting Warden in El Reno, suggested that a "joint interview" or "press conference" be held. Kimberlin agreed to the press conference, which was scheduled for 7:00 p.m. that evening. Administrative Tort Claim # 89–324, Letter from Carolyn A. Sabol to Howard T. Rosenblatt (June 19, 1990), *reprinted in* J.A. at 66, 67; Declaration of Brett C. Kimberlin, *reprinted in* J.A. at 72, 72–73. Director Quinlan cancelled the press conference. Quinlan/Keating Memorandum, *supra*, J.A. 95. Reporters who arrived at the prison for the press conference were told that it had been cancelled due to "unfor[e]seen circumstances." Press Release (Nov. 4, 1988), *reprinted in* J.A. at 37.

Later that night, Director Quinlan ordered Kimberlin into "administrative detention," which, according to BOP regulations, confines the inmate in a special cell and removes him from the general prison population. 28 C.F.R. § 541.22 (1992). At 10:30 p.m. on November 4, Kimberlin was handcuffed, wheelbarrow-marched across the outdoor compound without a coat, strip searched, and locked into a small cell. Kimberlin Declaration, *supra*, J.A. 73. He was expressly forbidden to make phone calls until the next afternoon, when a duty officer demanded that he call Totenberg. *Id.*, at 74; FCI El

---

3. Kimberlin also alleges that the defendants caused him to suffer continual harassment for exercising his First Amendment rights when he was placed in administrative detention on December 22, 1988, after talking to reporters about his Quayle story. However, Kimberlin has not corroborated this allegation with specific facts linking the defendants to the December 22 detention; therefore, I agree that it does not survive a heightened pleading standard.

Reno Special Housing Unit Record, *reprinted in* J.A. at 87. Kimberlin was released at 7:30 p.m. on Saturday, November 5.

That weekend, Kimberlin made several phone calls to arrange a telephone interview with reporters who would gather at the Mayflower Hotel in Washington, D.C. on the morning of Monday, November 7, the day before the election. Again, the interview with the press never took place. At 9:00 a.m., before the planned telephone interview, Kimberlin was once more taken to the administrative detention unit, strip searched, and locked in a detention cell, this time for seven days. Kimberlin was allowed to call his lawyer, but not his family or the press. Kimberlin Declaration, *supra*, J.A. 74–75.

Thus, Kimberlin was confined in administrative detention on two separate occasions, either immediately after or prior to contact with the media. The *timing* of these detentions alone supports an inference that they were intended to silence Kimberlin or retaliate against him for speaking to the media. This inference is further supported by the conflicting, and seemingly pretextual, explanations offered by Directors Quinlan and Miller regarding the reasons for Kimberlin's detentions. Indeed, there are many details of the Quinlan and Miller stories that strongly support a claim that they acted with a purpose to infringe Kimberlin's clearly established First Amendment rights.

First, there are inconsistencies in the Quinlan and Miller stories concerning the reason for Kimberlin's November 4 detention. In a memorandum, Quinlan explains that he instructed the El Reno officials to place Kimberlin in detention, "pending an assessment of any possible threat," after being informed that Nina Totenberg had told Miller of the DOJ that "she believed Kimberlin might be in some 'danger.'" Quinlan/Keating Memorandum, *supra*, J.A. 95. Miller confirms that he learned from Totenberg that Kimberlin had expressed fear for his safety, but denies that safety concerns had any influence on the decision to put Kimberlin in detention. Memorandum from Loye Miller to Whom It May Concern (Oct. 11, 1989), *reprinted in* J.A. at 82, 84–85.

Second, there is further evidence that the justification that Kimberlin was placed in detention for his protection is pretextual. In a sworn statement, Totenberg denies that she "quoted Kimberlin as saying his [ ] life was in danger." Totenberg Declaration, *supra*, J.A. 80. Kimberlin also denies having expressed concern for his safety. Kimberlin Declaration, *supra*, J.A. 73–74. Furthermore, there was no reason to restrict Kimberlin's phone calls if he was in detention for his safety; in fact, prison regulations *require* the warden to establish procedures for inmates in segregation to make phone calls. 28 C.F.R. § 540.105 (1992). Yet, Kimberlin was expressly forbidden to make phone calls during the first detention until the afternoon of November 5. Kimberlin Declaration, *supra*, J.A. 74; Special Housing Unit Record, *supra*, J.A. 87.

Third, it was highly unusual for high-ranking officials such as Miller and Quinlan to become involved in an administrative detention decision. John Pendleton, congressional liaison for the BOP, told the *Legal Times* that he could not "think of another instance in which the director of the bureau made the decision to place an inmate in administrative detention. The system houses some 45,000 inmates." Aaron Freiwald, *Isolation for Inmate with Quayle Claims*, LEGAL TIMES, Dec. 19, 1988, *reprinted in* J.A. at 88, 90.

Fourth, there are conflicting and pretextual explanations regarding Kimberlin's second detention, and the Quinlan and Miller involvements with it. In various writings, Quinlan denies that he or the BOP's Central Office was involved in ordering the second detention. Quinlan/Keating Memorandum, *supra*, J.A. 96; Letter from J. Michael Quinlan to Robert W. Kastenmeier (Aug. 29, 1990), *reprinted in* J.A. at 106, 108. But Miller told the *New York Times* that "Kimberlin was *twice* placed in administrative detention on the order of *J. Michael Quinlan*." *Solitary for Quayle's Accuser*, N.Y. TIMES, Dec. 20, 1988, *reprinted in* J.A. at 109 (emphasis added). Furthermore, on November 7, Quinlan was sent the tapes of Kimberlin's telephone conversations "with numerous news media personnel, family and friends," and the report of an investigative supervisor

at the prison who had "spent the past three days" working on the case. Memorandum from T.C. Martin to J. Michael Quinlan (Nov. 7, 1988), *reprinted in* J.A. at 111. Thus, there is evidence that strongly suggests that Quinlan was following Kimberlin's situation closely, and may well have been involved in ordering the second detention. Miller, who also denies involvement with the second detention, acknowledges that he called the BOP on the morning of November 7 and learned that Kimberlin had again been detained. Miller Memorandum, *supra,* J.A. 85–86. Thus, Miller too was closely tracking Kimberlin's status.

The explanation that Quinlan and the BOP have offered for the second detention is contradicted by prison documents. In a letter to Senator Joseph Biden, Quinlan stated that Kimberlin was sent to detention for a violation of prison regulations committed on *Monday, November 7,* when he attempted to place a call through a third party. Letter from J. Michael Quinlan to Joseph R. Biden, Jr. (Dec. 22, 1988), *reprinted in* J.A. at 77, 78. In a later letter, Quinlan wrote that "Kimberlin was *attempting to set up a telephonic press conference,* using an impermissible 'third party' procedure.... The telephone violation was the sole reason that the local officials decided to place him in detention on Monday morning...." Quinlan/Kastenmeier Letter, *supra,* J.A. 108 (emphasis added); *see also* Administrative Claim, *supra,* J.A. 68–69 (stating that "[o]n Monday, November 7, 1988, upon review of intelligence information, it was determined that Mr. Kimberlin was attempting to use the telephone to set up a press conference in Washington D.C. that morning. As a result, Mr. Kimberlin was again placed in administrative detention...."). According to prison documents, however, Kimberlin was charged and found guilty of violating prison regulations for placing a third-party phone call on *Friday, November 4,* when he had attempted to call Susan Estrich, the manager of the Dukakis campaign, through a third party. *See* Incident Report (Nov. 7, 1988), *reprinted in* J.A. at 53; Disciplinary Hearing Report (Nov. 14, 1988), *reprinted in* J.A. at 56, 56–57.

Miller himself has contradicted the BOP's explanation that Kimberlin was placed in detention for violating prison telephone rules. Miller wrote in a memorandum that "[i]t was certainly my understanding at the time that it was this attempt to hold an unauthorized press conference which directly caused [Kimberlin] to be segregated once again." Miller Memorandum, *supra,* J.A. 86. The *Legal Times* quotes Miller as saying that "[t]he BOP caught on that [Kimberlin] was going to hold another press conference, ... so they put him back in." *Isolation for Inmate, supra,* J.A. 90.

Fifth, there is uncontested evidence that the Bush–Quayle campaign was in close contact with Quinlan at the BOP and Miller at the DOJ during the time when Kimberlin was trying to contact the media and being placed in detention, and that Bush–Quayle campaign officials were concerned about the possible impact of Kimberlin's story on the election. According to Quinlan, the Bush–Quayle campaign called the BOP on November 3 to learn more about the NBC interview with Quinlan. Quinlan/Keating Memorandum, *supra,* J.A. 96. When campaign official Mark Goodin learned about the press conference that was to take place on November 4, he called the DOJ and spoke with Miller and one of his assistants. Miller's assistant informed Goodin that, "unless there was an immediate security concern, ... it was within a prisoner's parameters to [hold a press conference.]" Goodin Deposition, *supra,* J.A. 104. Miller, who was already apprised of the press conference, confirmed his assistant's information:

> [Goodin] said "This Kimberlin fellow apparently is going to have a press conference. I'm amazed."
>
> [Miller] said, "Well, amazed or not, he's going to have one. It's within his rights to have one according to the rules and regulations."
>
> And [Goodin] said, "I am bowled over."
>
> And [Miller] said, "Its a fact."

*Id.* at 105.

Further, Goodin was in close contact with Miller over the weekend of November 5, when Kimberlin was setting up his telephone interview for November 7. Goodin called

Miller several times that weekend to ask about the Kimberlin situation and to update Miller on the Quayle campaign's strategy if the Kimberlin story were to break. Goodin told Miller that he planned to travel with Quayle on Monday to handle press relations. Miller Memorandum, *supra*, J.A. 85.

Sixth, Quinlan's explanation of his sudden decision to cancel the November 4 press conference at the prison is entirely suspect. Reporters were told that the press conference was cancelled due to "unfor[e]seen circumstances." Press Release, *supra*, J.A. 37. Quinlan later wrote in a memorandum that he learned about the press conference from a wire service's inquiry, and that his decision to cancel the conference was based on "the fact that the Bureau's policy on media access permits individual media contacts by inmates, as well as small press pools under specialized circumstances, but does not authorize inmate press conferences." Quinlan/Keating Memorandum, *supra*, J.A. 95. Contrary to Quinlan's statement, however, the BOP's regulations do *not* disallow press conferences. *See* 28 C.F.R. § 540.63(h)(4) (permitting the Warden to "[l]imit the ... number of media personnel entering the institution if the Warden determines that the requested ... personnel would create a disruption within the institution"); *see also* 28 C.F.R. § 540.64 (permitting the Warden to establish a press pool "whenever he or she determines that the frequency of requests for interviews and visits reaches a volume that warrants limitations"). In fact, prison officials at El Reno initially suggested the press conference. Administrative Claim, *supra*, J.A. 67.

Miller of the DOJ may also have been involved in the cancellation of the November 4 press conference. According to Miller, he called the BOP on November 4 to ask about the press conference. He did not talk to Quinlan, and was unsure whether the BOP knew about the press conference before his call. An hour or two later, Miller heard that, "when Director Quinlan had learned that the prison warden was about to allow a Kimberlin press conference, he (Quinlan) had ordered it called off." Miller Memorandum, *supra*, J.A. 82–83. According to Nina Toten-

berg's affidavit, Miller told her that the press conference had been cancelled per orders from the DOJ. Totenberg Declaration, *supra*, J.A. 80.

To summarize, the record shows that Quinlan and Miller have offered conflicting, inconsistent and seemingly pretextual explanations for Kimberlin's detentions on November 4 and 7. There is further evidence that the Bush–Quayle campaign officials were in close contact with Miller during the time of Kimberlin's detentions and were upset over the possibility of Kimberlin's story receiving media attention. Quinlan (and possibly Miller) directly prevented Kimberlin from speaking with reporters on November 4, and Quinlan has offered an incredible explanation for his decision to cancel that press conference. The record thus contains powerful circumstantial evidence of the defendants' illegal motivation for placing Kimberlin in detention.

The information that Kimberlin has presented also satisfies a heightened pleading standard (assuming we may apply one). He has provided the specific dates, events and actions surrounding his allegations, thereby putting the defendants on notice of the charges against them. He has corroborated the facts pled in his allegations with administrative documents and newspaper articles, and has provided reliable evidence—such as affidavits and federal regulations—that cast suspicion on the veracity of the defendants' denials. He has also alleged that the defendants took certain action—specifically, causing him to be placed in administrative detention—that, if proven at trial, would support the inference that the defendants acted with impermissible motive. In short, the plaintiff has provided nonconclusory, factually-based, and specific allegations of unconstitutional intent. To expect more from Kimberlin would be to compel him to prove his case at the pleading stage, something that neither the Federal Rules nor common sense require.

II. THE HEIGHTENED PLEADING STANDARD

Generally, in civil cases, plaintiffs are entitled to discovery if they set forth in their complaint a " 'short and plain statement of

the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957) (quoting FED.R.CIV.P. 8(a)(2)). In *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), however, the Supreme Court concluded that "bare allegations of malice should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery." *Id.,* at 817–18, 102 S.Ct. at 2738. The purpose of the qualified immunity rule in *Harlow* was to dispose of "insubstantial" claims prior to discovery and trial. *See id.,* at 815–16, 102 S.Ct. at 2737. Thus, *Harlow* held that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.,* at 818, 102 S.Ct. at 2738. Although the Court purported to eliminate inquiry into the subjective intent of Government officials, *Harlow* did not discuss cases in which unconstitutional motive is an essential element of the claim.

Two years after the decision in *Harlow,* this court considered the question not reached in *Harlow.* In *Hobson v. Wilson,* 237 U.S.App.D.C. 219, 737 F.2d 1 (D.C.Cir. 1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985), the court held that, in cases in which the motive of Government officials is an essential element of the claim, a plaintiff's pleading must rest on non-conclusory allegations to support a claim of unconstitutional motive. *See id.,* 737 F.2d at 29. *Hobson* did not distinguish between "direct" and "circumstantial" evidence; however, six years after *Hobson,* in *Siegert v. Gilley,* 895 F.2d 797, 802 (D.C.Cir.1990), *aff'd on other grounds,* 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991), a different panel of the court held that a plaintiff's pleadings must provide *direct,* as opposed to circumstantial, evidence of unconstitutional motive in order to survive a motion to dismiss.

*Hobson* and *Siegert* are irreconcilable in their commands, thus it appears that the panel in *Siegert* ignored the law of the circuit in adopting a "direct evidence rule." Nonetheless, the majority in this case ignores *Hobson* and relies on *Siegert,* instead, in dismissing Kimberlin's case. Even if *Siegert* can somehow be read merely as an "outgrowth" of *Hobson*—a fanciful claim, I think—it ought to be reconsidered by the court *en banc.* The simple truth here is that a "direct evidence rule" finds no support in the Federal Rules, is at odds with Supreme Court precedent, defies the case law of this and other circuits, and is a nonsensical notion.

As an initial matter, as noted above, the Supreme Court's recent decision in *Leatherman* calls into question even the underlying rationale of the heightened pleading standard in *Hobson.* In *Hobson,* this court justified the heightened pleading requirement as a "firm application of the Federal Rules of Civil Procedure." *See Hobson,* 737 F.2d at 29–30 & n. 86 (citing *Butz v. Economou,* 438 U.S. 478, 508, 98 S.Ct. 2894, 2911, 57 L.Ed.2d 895 (1978)). In *Leatherman,* however, the Supreme Court held that it was *"impossible to square"* a heightened pleading standard similar to the one in *Hobson*[4] with the "liberal system of 'notice pleading' set up by [FED.R.CIV.P. 8(a)]." *Leatherman,* —— U.S. at ——, 113 S.Ct. at 1163 (emphasis added). Further, the Supreme Court noted that Rule 9(b) contains an exclusive list of actions for which particularized pleading may be required, and that, in the absence of an amendment to the Rules, the courts may not require particularized pleading in causes of action not listed in Rule 9(b). *Id.; see* FED. R.CIV.P. 9(b) (requiring particularized pleading in cases alleging fraud and mistake). The Court's decision in *Leatherman* thus employs a strict reading of Rules 8 and 9 that suggests strongly that any heightened pleading standard is *impossible to square* with the Rules, and is therefore invalid.[5]

---

4. The heightened pleading standard struck down in *Leatherman* required " 'that the plaintiff's complaints state with factual detail and particularity the basis for the claim.' " —— U.S. at ——,

113 S.Ct. at 1163 (quoting *Elliott v. Perez,* 751 F.2d 1472, 1473 (5th Cir.1985)).

5. The majority's suggestion that *Leatherman* is distinguishable because it spoke only to the stan-

Even if we assume that *some* form of a heightened pleading requirement may be imposed in cases involving a qualified immunity defense, today's holding still cannot stand. Nothing in *Hobson* reasonably can be read to invoke a categorical distinction between direct and circumstantial evidence. Rather, the court in *Hobson* ruled that,

> in cases involving a claim that defendants acted with an unconstitutional motive, we will require that *nonconclusory allegations [or] evidence of such intent* must be present in a complaint for litigants to proceed to discovery on the claim. The allegations on this issue need not be extensive, but they will have to be sufficiently precise to put defendants on notice of the nature of the claim and enable them to prepare a response and, where appropriate, a summary judgment motion on qualified immunity grounds.

737 F.2d at 29 (emphasis added). *Hobson* also stated that "*Harlow* requires that merely conclusory allegations of unconstitutional motive, *devoid of factual support,* must be found lacking and dismissed." *Id.,* at 31

(emphasis added). Thus, the pleading standard in *Hobson* was intended to ensure that there was a factual basis for the plaintiff's allegations and that Government officials be put on notice of the specific claims against them; *Hobson* was not concerned about the plaintiff's use of direct as opposed to circumstantial evidence.[6]

The court's later decision in *Siegert* inexplicably characterizes the complaint in *Hobson* as "an example of allegations of direct evidence of improper motivation that *will* overcome a defense of qualified immunity." *Siegert,* 895 F.2d at 804. A careful examination of *Hobson* reveals that the complaint in that case referred to memoranda that provided "direct evidence" of the unconstitutional intent of only two of the five *Hobson* defendants; the illegal intent of the other three *Hobson* defendants was established by strong circumstantial evidence. *See Hobson,* 737 F.2d at 8–9 (noting that incriminating memoranda were issued by defendants Brennan and Moore, but not by defendants Jones, Grimaldi and Pangburn).[7] If *Siegert* really

---

dard of pleading for motions to dismiss, *see* Maj. Op. at 794 n. 9, is disingenuous. Although the majority chooses to treat appellants' motion as one for summary judgment, the majority's reading of this court's precedents makes clear that it would reach the same result were this strictly a motion for dismissal. *See id.* at 793 (D.C. Circuit's heightened pleading standard "requir[es] pleading of specific *direct* evidence of intent to defeat a motion to dismiss") (emphasis in original); 794 (citing cases applying heightened pleading standard to motions to dismiss, *e.g., Siegert; Whitacre v. Davey,* 890 F.2d 1168 (D.C.Cir.1989), *cert. denied,* 497 U.S. 1038, 110 S.Ct. 3301, 111 L.Ed.2d 810 (1990)).

Moreover, calling plaintiff's burden one of "production" rather than "pleading" draws a distinction without a difference. For the fact remains that in this circuit, plaintiffs alleging unconstitutional motive are not afforded *any* discovery unless their *pleadings* meet a certain threshold, higher than that required by the Federal Rules of Civil Procedure. In the ordinary summary judgment context, Rule 56(f) expressly gives the trial judge broad discretion to order discovery prior to ruling on a summary judgment motion, where the party opposing the motion cannot "present by affidavit facts essential to justify the party's opposition...." FED.R.CIV.P. 56(f). Yet the cases on which the majority relies effectively strip the trial judge of that discretion. *See Siegert,* 895 F.2d at 802 (plaintiff must plead intent with specific, discernible facts or direct evidence "in order to obtain even limited discov-

ery"); *Whitacre,* 890 F.2d at 1171 n. 4 (plaintiff's claim "must be dismissed immediately" in absence of direct evidence of unconstitutional intent). The net effect, therefore, is to require plaintiffs' *pleadings* to meet a higher threshold than is required by the Rules—a result that *Leatherman* disparages.

6. The *Hobson* panel derived its heightened pleading standard from the Second Circuit's requirement of pleading with particularity in civil rights complaints. The Second Circuit's rule provides that "complaints containing only 'conclusory,' 'vague,' or 'general allegations' of a conspiracy to deprive a person of constitutional rights will be dismissed." *Hobson,* 737 F.2d at 30 (quoting *Ostrer v. Aronwald,* 567 F.2d 551, 553 (2d Cir. 1977)).

7. *Siegert* noted that "[the *Hobson* ] complaint referred to specific memoranda admitting that the [COINTELPRO–New Left] program's express purpose was to disrupt plaintiffs' political activities." *Siegert,* 895 F.2d at 804. In fact, only two of the five *Hobson* defendants were actually authors of some of the incriminating memoranda; the other three defendants were known to have been supervisors in a division of the FBI during the time in which that division had engaged in COINTELPRO activities. *See Hobson,* 737 F.2d at 8–9. The "specific memoranda" to which the *Hobson* complaint referred had been summarized in a 1976 Senate Report studying the Gov-

meant to adhere to *Hobson* as it arose and as it was decided, then the direct evidence requirement enunciated in *Siegert* cannot be seen to rest on a categorical distinction between direct and circumstantial evidence, and the pleading standard in *Siegert* can be reconciled with the pleading standard in *Hobson*. Instead of direct evidence, *Siegert* can be read to require precise, nonconclusory allegations supported by direct *or circumstantial* evidence of unconstitutional intent—which is exactly what the complaint in *Hobson* provided. *See Kimberlin v. Quinlan,* 774 F.Supp. 1, 6 (D.D.C.1991) (reasoning that *Siegert* "does not appear to have turned on the distinction between direct and circumstantial evidence as understood in the law of evidence, but on the question whether the plaintiff had proffered something other than mere conclusions, namely tangible allegations of concrete facts corroborative of [the plaintiff's] own subjective version of the events"). However, if the *Siegert* court really meant to require direct as opposed to circumstantial evidence, then the pleading standard adopted by *Siegert* cannot be reconciled with *Hobson*.

The apparent confusion of the *Siegert* majority over the meaning of the standard in *Hobson* can be traced to several decisions rendered in the aftermath of *Hobson*. In *Martin v. D.C. Metropolitan Police Department,* 812 F.2d 1425 (D.C.Cir.1987), the panel majority held that a plaintiff must present "more than inferential or circumstantial support for his allegation of unconstitutional motive. That is, some direct evidence that the officials' actions were improperly motivated...." *Id.,* at 1435. *Martin* borrowed the "direct evidence" language from a trial court in Maryland, which had fashioned a "direct evidence" pleading requirement out of whole cloth. *Harris v. Eichbaum,* 642 F.Supp. 1056, 1066 (D.Md.1986), *cited in Martin,* 812 F.2d at 1435. Although this ill-chosen language appears to be the source of the direct evidence standard, a close examination of the reasoning in *Martin* reveals that there is no basis (other than the bare, unexplained words) to believe that the *Martin* majority intended to require plaintiffs to plead direct, as opposed to circumstantial, evidence of unconstitutional motive. Certainly, there is no reason to elevate this language, plucked from a district court opinion, over the binding precedent established by this court in *Hobson*.

First, and most tellingly, the majority opinion in *Martin* explicitly affirmed an intention to remain faithful to *Hobson*. In its holding, *Martin* instructed the trial court to defer its decision on the defendants' motion for summary judgment until after the plaintiff had obtained limited discovery [8] and had presented "an amended complaint *meeting the standard set out in* Hobson, 737 F.2d at 29." *Martin,* 812 F.2d at 1438 (emphasis added). Thus, *Martin* purported to be faithful to the heightened pleading standard in *Hobson*. *See also id.,* at 1434 (quoting *Hobson,* 737 F.2d at 30, that plaintiffs "must 'produce some factual support for their claim

ernment's domestic intelligence activities. *See id.,* at 10 n. 8; *see also* Select Comm. To Study Governmental Operations with respect to Intelligence Activities, Book II, Intelligence Activities and the Rights of Americans, S.Rep. No. 755, 94th Cong., 2d Sess. 86–93, 211–23 and accompanying footnotes (1976).

8. In *Martin,* the primary issue was whether the defendants might obtain limited discovery for the purpose of meeting the heightened pleading standard, and the secondary issue was whether the pleadings in the case were sufficient. The panel majority held that strictly limited discovery could be allowed before a plaintiff was required to meet the heightened pleading standard. 812 F.2d at 1438. Judge Starr entered his strong dissent to the *Martin* majority's decision to allow this limited discovery. *Id.,* at 1439–40, 1442 (Starr, J., dissenting in part). The *en banc* court

thereafter granted rehearing and vacated the section of the *Martin* majority opinion that discussed the pleading standard and allowed limited discovery. *Martin v. D.C. Metropolitan Police Dep't,* 817 F.2d 144 (D.C.Cir.1987) (en banc).

On its own motion, the court later denied rehearing en banc, *Bartlett v. Bowen,* 824 F.2d 1240, 1241 (D.C.Cir.1987) (en banc), and reinstated the majority and dissenting opinions. In the statements attached to *Bartlett,* the debate over the precedential value of *Hobson* focuses not on the formulation or wording of the heightened pleading standard, but rather on whether a plaintiff should be permitted limited discovery for the purpose of meeting the heightened pleading standard announced in *Hobson*. *Id.,* at 1245–46 (Ginsburg, R.B., J., concurring); *id.,* at 1246 (Silberman, J., concurring); *id.,* at 1249 (Bork, Starr, Buckley, Williams & Ginsburg, D.H., JJ., dissenting in a joint statement).

[of unconstitutional motive] to avert dismissal' "); *id.*, at 1438 (Edwards, J., concurring) (noting that "the majority opinion is not unfaithful to the teachings of *Hobson*"). The logical conclusion is that *Martin* simply intended to restate the *Hobson* pleading requirement. Most certainly, there is nothing in *Martin* that shows an intent to replace *Hobson* with a more rigorous pleading standard.

Second, *Martin* was concerned with the *overall probative quality* of the plaintiff's evidence at the pleading stage, not with its characterization as direct or circumstantial. *Martin* characterized its heightened pleading standard as a *"[l]imitation* [ ] ... on the range of inferences a trial court may draw," (not as a *prohibition* on the trial court's reliance on inferences), and illustrated the standard with examples from antitrust cases. *Id.*, at 1435–36 (emphasis added). A review of the cited antitrust cases confirms that *not one of them* invokes a distinction between direct and circumstantial evidence. *See especially Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984) (permitting "direct *or circumstantial* " evidence to support an inference of conspiracy) (emphasis added), *cited in Martin*, 812 F.2d at 1436. *Martin* also concluded that "[the plaintiff's] fact recitations, as they now stand, are *insufficiently probative* of the alleged unconstitutional motive to warrant denial of the [defendants'] motion for summary judgment." 812 F.2d at 1436 (emphasis added); *but see id.* (noting that the plaintiff had produced no direct evidence of the defendants' unconstitutional motive). Needless to say, this focus on the probative quality of the evidence is entirely consistent with the pleading requirement in *Hobson.*

The distortion of *Hobson* can also be traced to *Whitacre v. Davey*, 890 F.2d 1168 (D.C.Cir.1989), *cert. denied*, 497 U.S. 1038, 110 S.Ct. 3301, 111 L.Ed.2d 810 (1990), in which the court incorrectly opined that *Martin* "made clear that if a plaintiff failed to allege direct evidence of unconstitutional in-

tent, his claim must be dismissed immediately." *Id.*, at 1171 n. 4. *Whitacre* has no precedential weight, however, because the court in that case did not rely on the plaintiff's lack of direct evidence when it dismissed the plaintiff's claim. *Id.*, at 1172.

The *Siegert* majority attempted to summarize and clarify the court's holdings in *Hobson, Martin* and *Whitacre*, but, in so doing, the majority mistakenly latched onto the "direct evidence" language in *Martin* and incorrectly concluded that,

> under this court's heightened pleading standard, in order to obtain even limited discovery, [unconstitutional] intent must be pleaded with specific, discernible facts or offers of proof that constitute direct as opposed to merely circumstantial evidence of the intent.

*Siegert*, 895 F.2d at 802. Indeed, the *Siegert* majority insisted that the plaintiff must offer direct evidence of impermissible motive, contrasting "direct" with "circumstantial" evidence in at least two places in the opinion, *see id.*, at 802, 803, even though there is no foundation for this pleading standard in either *Hobson* or *Martin*—the two cases upon which *Siegert* principally relied.

Regrettably, the Supreme Court did not address the heightened pleading standard when it affirmed the court's judgment in *Siegert.*[9] However, Justice Kennedy specifically wrote in a separate concurrence that he would "reject ... the Court of Appeals' statement that a plaintiff must present direct, as opposed to circumstantial, evidence." *Siegert*, 500 U.S. at ——, 111 S.Ct. at 1795 (Kennedy, J., concurring). Instead, Justice Kennedy wrote that a heightened pleading standard should require a plaintiff to "put forward specific, nonconclusory factual allegations which establish malice, or face dismissal." *Id.* In his dissent, Justice Marshall (joined by Justices Blackmun and Stevens) also stated that the court of appeals "erred in holding" that a plaintiff must proffer *"direct* evidence of the unconstitutional motive." *Id.*, at ——, 111 S.Ct. at 1800 (Marshall, J., dissenting). At least three justices of the

---

9. The Supreme Court affirmed on the basis that the plaintiff's allegations, even if true, did not state a claim for the violation of any rights pro-

tected by the Constitution. *Siegert*, 500 U.S. at ——, 111 S.Ct. at 1791.

current Supreme Court have therefore made plain that they believe that a "direct evidence rule" is error.

Following the Supreme Court's decision in *Siegert*, this court's application of the heightened pleading standard has floundered. In *Hunter v. District of Columbia*, 943 F.2d 69 (D.C.Cir.1991), the panel held that "[t]he [heightened] pleading standard requires no more than that the plaintiff tell his story, relating the pertinent information that is already in his possession." *Id.*, at 76 (citing to Justice Marshall's dissent in *Siegert* for analogous support). Shortly after *Hunter* was decided, in *Crawford-El v. Britton*, 951 F.2d 1314 (D.C.Cir.1991), *cert. denied*, —— U.S. ——, 113 S.Ct. 62, 121 L.Ed.2d 29 (1992), the court applied the *Hobson* formulation of the heightened pleading standard without reference to the direct evidence requirement in *Siegert*.[10] *Id.*, at 1317 (quoting *Andrews v. Wilkins*, 934 F.2d 1267, 1269–70 (D.C.Cir. 1991) (quoting *Hobson*, 737 F.2d at 30)). *Crawford-El* also noted that *Hunter* had clarified the scope of this circuit's heightened pleading standard. *Id.*, at 1322. If nothing else, *Hunter* and *Crawford-El* show that there is considerable confusion in this circuit about the correct formulation of the heightened pleading standard.

To summarize, the heightened pleading standard, as originally formulated in *Hobson*, makes no mention of "direct evidence" and does not provide the basis of a pleading standard that requires direct, as opposed to circumstantial, evidence. The "direct evidence" language that forms the basis of the majority's holding today arose out of thin air in *Martin*, borrowed from a district court opinion that likewise conjured the language out of thin air. While the "direct evidence" language in *Martin* was reconcilable with the *Hobson* standard, subsequent cases such as *Whitacre* and *Siegert* have poured an unintended significance into the language that is fundamentally irreconcilable with the standard in *Hobson*.

Faced with an irreconcilable difference between two heightened pleading standards, a panel of this court is not free to overrule the original standard with a subsequent distortion of that standard. The pleading requirement in *Hobson* is binding precedent. *See Martin*, 812 F.2d at 1440 (Starr, J., dissenting in part) ("Even if one has latter-day doubts as to *Hobson*'s wisdom, the pleading requirement which it so clearly articulates is the law of this circuit. We are bound to follow it.").

## III. THE DISTINCTION BETWEEN DIRECT AND CIRCUMSTANTIAL EVIDENCE

It is also incomprehensible to me why this court would want to adopt a test that compels plaintiffs to base their pleadings on "direct evidence" or suffer dismissal—unless the court intends to eliminate all civil rights actions involving unconstitutional motive. As noted in *Harlow*, the purpose of the qualified immunity defense is to winnow out insubstantial claims before they reach discovery and trial. *Harlow*, 457 U.S. at 815–18, 102 S.Ct. at 2736–38. But the distinction between direct and circumstantial evidence is irrelevant to determining the likely merits of a claim.

It is indisputable that the probative value of circumstantial evidence is "intrinsically no different from testimonial evidence," *Holland v. United States*, 348 U.S. 121, 140, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954), and can in some cases be "more certain, satisfying and persuasive than direct evidence." *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330, 81 S.Ct. 6, 11, 5 L.Ed.2d 20 (1960). Circumstantial evidence can be of high probative quality. For example, if one goes to bed and there is no snow on the ground, and one wakes up to find snow on the ground, the snow is powerful evidence—albeit wholly circumstantial—that it snowed while one was asleep. Conversely, direct evidence can consist of something as incredible and unreliable as the testimony of a convicted perjurer who asserts that the defendant confessed his intent and motive to him. If Kimberlin had supported his pleadings with one such affidavit, the majority would now be constrained to

---

10. *Crawford-El* cited *Siegert*, *Whitacre*, and *Martin*, but made no reference to direct evidence.

*Crawford-El*, 951 F.2d at 1317–18.

allow him to continue with his suit. I see no reason why this type of direct evidence should suffice to allow a plaintiff to proceed to discovery, when strong circumstantial evidence of a pattern of conduct that overwhelmingly supports an inference that the defendants acted with unconstitutional motive—evidence that Kimberlin has proffered—would not. Redress for violations of the Constitution surely should not rest on such flimsy distinctions.

It is also well-recognized that, in almost any claim involving motive, a defendant's state of mind is typically established by circumstantial evidence because of the difficulty in obtaining direct evidence of motive.[11] In criminal cases, for example, where the burden of proof is considerably higher than in a *Bivens* suit, this court and others have recognized that "[i]ntent may, and generally must, be proved circumstantially; normally, the natural probable consequences of an act may satisfactorily evidence the state of mind accompanying it." *United States v. Jackson,* 513 F.2d 456, 461 (D.C.Cir.1975) (footnotes omitted).[12] Nor does this court distinguish between direct and circumstantial evidence when evaluating the sufficiency of the evidence in a criminal case. *United States v. Lam Kwong–Wah,* 924 F.2d 298, 303 (D.C.Cir.1991) ("No distinction is made between direct and circumstantial evidence in evaluating the sufficiency of evidence supporting a guilty verdict."), *cert. denied,* ——

U.S. ——, 113 S.Ct. 287, 121 L.Ed.2d 213 (1992); *see also United States v. Stone,* 748 F.2d 361, 362 (6th Cir.1984) (ruling that "circumstantial evidence alone can sustain a guilty verdict and that to do so, circumstantial evidence need *not* remove every reasonable hypothesis except guilt").

If circumstantial evidence suffices to prove intent beyond a reasonable doubt in a *criminal trial,* it should certainly satisfy this court's heightened *pleading* standard in a *civil* case. Indeed, to require plaintiffs to plead direct evidence of intent is to require plaintiffs to provide more evidence at the pleading stage than is required to win the case at trial. *See Crutcher,* 883 F.2d at 504 (rejecting direct evidence requirement because it would require plaintiff "to come forth with more evidence than she would have to produce to prevail on the merits"); *see also American Communications Ass'n v. Douds,* 339 U.S. 382, 411, 70 S.Ct. 674, 690, 94 L.Ed. 925 (1950) (noting that "courts and juries every day pass upon knowledge, belief and intent ... having before them no more than evidence of their words and conduct, from which, in ordinary human experience, mental condition may be inferred").

Given the recognized difficulty of proving intent by direct evidence, the effect of a direct evidence pleading requirement will be to prevent a plaintiff from overcoming the

---

**11.** *United States v. Bank of New England, N.A.,* 821 F.2d 844, 854 (1st Cir.) ("Willfulness can rarely be proven by direct evidence, since it is a state of mind; it is usually established by drawing reasonable inferences from the available facts."), *cert. denied,* 484 U.S. 943, 108 S.Ct. 328, 98 L.Ed.2d 356 (1987); *Mallette v. Scully,* 752 F.2d 26, 32 (2d Cir.1984) ("Because intent is formed in the mind in secrecy and silence ..., a determination of whether a deliberate intent was formed must be drawn from all the circumstances of the case. Circumstantial evidence of this subjective fact is therefore indispensable."); *United States v. Pope,* 739 F.2d 289, 291–92 (7th Cir.1984) ("Proof of the requisite state of mind need not be by direct evidence; it may be inferred from the surrounding facts and circumstances."); *United States v. Hudson,* 717 F.2d 1211, 1213 (8th Cir.1983) ("Willfulness, intent and guilty knowledge may also be proven by circumstantial evidence and frequently cannot be proven in any other way."); *United States v. Childs,* 463 F.2d 390, 392 (4th Cir.) ("Intent is

not susceptible of direct proof; it must be proved by circumstances.") (footnote omitted), *cert. denied,* 409 U.S. 966, 93 S.Ct. 271, 34 L.Ed.2d 232 (1972); 2 CHARLES A. WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 411 (2d ed. 1982) ("Though circumstantial evidence is used in virtually every criminal case, there are certain kinds of cases and issues on which it is almost indispensable, because it is so unlikely that direct evidence will be available. These include such matters as the existence of a conspiracy, criminal intent, or other issues involving state of mind.") (footnotes omitted); 2 JOHN H. WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW §§ 242, 244, 245 (Chadbourn rev. 1979) (intent, knowledge, belief, and state of mind may be evidenced by external circumstances and the defendant's conduct).

**12.** *See also United States v. Maggitt,* 784 F.2d 590, 593 (5th Cir.1986) (same); *United States v. Harris,* 558 F.2d 366, 369 (7th Cir.1977) (same); *United States v. White,* 557 F.2d 233, 236 (10th Cir.1977) (per curiam) (same).

qualified immunity defense except in the most extraordinary circumstances. In *Hobson*, for example, a 15–month "intensive" investigation by a Select Committee of the United States Senate turned up direct evidence that *two* of the five *Hobson* defendants had acted with intent to violate the plaintiffs' civil rights. *See* SELECT COMM. TO STUDY GOVERNMENTAL OPERATIONS, *supra* note 6, BOOK I, FOREIGN AND MILITARY OPERATIONS at III. If a direct evidence requirement has been applied in *Hobson*, however, the complaints brought against the other three defendants would have been dismissed for lack of direct evidence of intent. *See supra* note 6 and accompanying text.

Justice Marshall recognized this effect in his dissenting opinion in *Siegert.* Justice Marshall wrote that, "[b]ecause evidence of [unconstitutional] intent is peculiarly within the control of the defendant, the 'heightened pleading' rule employed by the Court of Appeals effectively precludes any *Bivens* action in which the defendant's state of mind is an element of the underlying claim." *Siegert*, 500 U.S. at ——–——, 111 S.Ct. at 1800–01 (Marshall, J., dissenting). Two other circuits have wisely rejected a heightened pleading standard that requires direct evidence for this very reason. *Branch*, 937 F.2d at 1386–87 ("Because evidence of intent is largely within the control of the defendant and often can be obtained only through discovery, we are unwilling to require a plaintiff to present direct evidence of that intent in order to avert dismissal."); *Elliott*, 937 F.2d at 345 ("Requiring 'direct' evidence of intent would be fatal in all but the rare case in which the defendant confessed."); *see also Siegert*, 895 F.2d at 806 (Wald, C.J., dissenting in part) ("The policy of requiring specific, direct evidence of the defendant's unconstitutional intent, when unflinchingly applied to all cases in which a qualified immunity defense is raised, effectively cuts off both bona fide and ill-motivated suits.").

A pleading standard that effectively precludes all *Bivens* actions that involve unconstitutional motive is a cynical perversion of this court's responsibility to strike a balance between the "evils inevitable" in resolving immunity questions—the evil of shutting out meritorious civil rights claims, and the evil of exposing Government officials to the burdens of litigation and liability. *Harlow*, 457 U.S. at 813–14, 102 S.Ct. at 2735–36. And, because the direct evidence requirement effectively precludes an entire class of civil rights claims, it stands in flat contradiction with the dictates of *Bivens* itself, which reaffirmed the notion that " '[t]he very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury.' " *Bivens*, 403 U.S. at 397, 91 S.Ct. at 2005 (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163, 2 L.Ed. 60 (1803)). As both Justice Kennedy and Justice Marshall indicated in *Siegert*, there is "no warrant for … a [direct evidence] rule as a matter of precedent or common sense." *Siegert*, 500 U.S. at ——, 111 S.Ct. at 1801 (Marshall, J., dissenting); *id.*, at ——, 111 S.Ct. at 1795 (Kennedy, J. concurring) ("Circumstantial evidence may be as probative as testimonial evidence.").

## IV. CONCLUSION

In an admonition all too prescient, the *Hobson* panel cautioned the court against applying its heightened pleading requirement too rigidly, lest it result in the dismissal of meritorious claims. *Hobson*, 737 F.2d at 30–31. But this is exactly what has happened in this case. We must not lose sight of what has happened here. A citizen of the United States suggested to the media that he had damaging information about the candidate for the second-highest executive position in our democracy. Just days before the election, he was twice placed in "administrative detention," where he was effectively precluded from sharing his story with an understandably curious media. While we might expect such official action not to raise eyebrows in a country with fewer guarantees of civil liberty, such action is unfathomable in this country under our constitutional system of government. I simply cannot imagine that the judiciary of the United States will shut the doors of the courthouse and refuse to allow Kimberlin's suit to proceed for the specious reason that his complaint is based on circumstantial evidence.

*I dissent.*